# WESTERN AND ATLANTIC RAILROAD COMPANY *v.* WESTERN UNION TELEGRAPH COMPANY.

1. A telegraph company may condemn a right of way on and along the right of way of a railroad company, when the proposed line of telegraph will be so constructed as to produce no material interference with the railroad company's free exercise of its franchise or with the actual operation of the railroad.

2. It is not a prerequisite to the exercise of such right of condemnation that the telegraph company should first file with the railroad commission its consent that the commission shall have jurisdiction over it for the purpose of regulating tolls on messages originating and ending within the State of Georgia.

3. A telegraph company may not condemn a railroad company's right of way on both sides of the track, at least without making it appear that it is necessary to occupy both sides and that the railroad company's operation of its trains will not be materially interfered with.

4. Where it appears that the, demands of a modern railroad company are such that a telegraph system is a necessary auxiliary to its safe and proper operation; and where it appears that present telegraph service is afforded to the railroad company by an existing line of telegraph by virtue of a contract between the railroad company and the telegraph company, which contract is about to terminate; and where it appears that the existing line is located on an advantageous portion of the right of way, and that the railroad company, in order to obtain the necessary telegraphic service, intends and purposes, in good faith, to construct a line of its own on the location of the old telegraph line, relatively to the telegraph company proposing to condemn a right of way, the railroad company has a preferential selection of the route. Under such circumstances the telegraph company will be enjoined from condemning the route which has been selected in good faith by the railroad company.

5. A railroad company can not defeat the exercise of the right of eminent domain by a telegraph company in constructing a line of telegraph on a portion of its right of way by the construction and maintenance of a line on both sides of its track, when a line on one side of its track is ample to furnish it with necessary telegraph service.

6. A telegraph company can not construct a line of telegraph over the land of the State without permission of the State. Civil Code, § 2811, does not grant that permission except upon due compensation. That section allows condemnation of the State's land by telegraph companies in

the same way as of the right of way of a railroad company and private land. The lessee of the State's road has only a usufructuary interest therein, and this can not be condemned by a telegraph company, separately and apart from the State, in the absence of legislative sanction. Any condemnation proceeding must be against both.

7. Where a telegraph company in its notice of condemnation seeks only to occupy a railroad company's right of way for the purpose of constructing and maintaining a telegraph line, the possibility of stringing telephone wires for the use of the telephone company is no objection to the right to condemn. When the telegraph company attempts to impose an additional servitude, the railroad company has its remedy against such act.

8. A telegraph company will not be permitted to condemn the right of way of a railroad company for the construction and maintenance of lines of telegraph in such a manner as to materially interfere with the railroad company in the operation of its trains and in the transportation of passengers and goods. A telegraph line so constructed and maintained as not to interfere with the transportation of passengers and goods beyond the State is not a burden on interstate commerce.

9. The ruling in the case of *Atlantic Coast Line R. Co.* v. *Postal Telegraph etc. Co.*, 120 *Ga.* 268 (48 S. E. 15, 1 Ann. Cas. 734), that the measure of damages, where the right of way of a railroad company is taken by a telegraph company, is the value of the land actually taken, and the extent to which the use of the right of way by the railroad company is diminished by its use by the telegraph company, that the right of way of a railroad company has no general market value for other uses than that to which it is applied, and that peculiar advantages and benefits accruing to a telegraph company from its use of the railroad's right of way can not be considered in the assessment of damages, has not the effect of putting the eminent-domain laws of the State in opposition to the due-process clause of the 14th amendment of the constitution of the United States.

July 11, 1912.

Petition for injunction. Before Judge Bell. Fulton superior court. March 18, 1912.

*Tye, Peeples & Jordan* and *Claude Waller,* for plaintiff.

*Dorsey, Brewster, Howell & Heyman,* for defendant.

Evans, P. J. Many of the questions presented by this record are novel, and arise from the peculiar facts of the case. The State of Georgia owns a railroad extending between Atlanta and Chattanooga, Tennessee. On the 19th day of July, 1890, by authority of the General Assembly (Acts 1889, p. 141), the railroad was leased to the Nashville, Chattanooga and St. Louis Railway for the period of 29 years from December 27th, 1890. The leasing company by the terms of the act became a body corporate under the name and style of the Western and Atlantic Railroad Company. Prior to

the lease there had been erected on the right of way of the railroad a line or lines of telegraph poles and wires. At that time and continuously since a line of wire on these poles was set apart for the exclusive use of the lessee in the transaction of its railroad business. In 1891 another line of wire was strung for the exclusive use of the leasing company, at considerable cost to the lessee. And in 1906 a line of double wires and a line of single wire were stretched upon the same poles at segmental parts of the railroad, at considerable expense to, and for the exclusive use of, the leasing company in the operation of the railroad. In 1884 the Western Union Telegraph Company and the Nashville, Chattanooga and St. Louis Railway Company entered into a .contract for the maintenance and operation of a telegraph line upon its own railroad and such other railroads as it might subsequently acquire by lease or purchase. This contract was to continue in force for twenty-five years from July 1st, 1884, and thereafter until the expiration of one year after written notice by either party to terminate the contract. In this contract the telegraph company obligated itself to set apart one wire on the main line for the preferential use of the railroad company and agreed that if the railroad company should require greater wire facilities the telegraph company would furnish an additional wire at the cost price upon poles already erected, and that the railroad company at its own cost would string such additional wire. In August, 1911, the telegraph company gave to the railroad company written notice of its intention to terminate the contract after the expiration of one year. The telegraph company then opened up negotiations with the Western and Atlantic Railroad Company to purchase an easement for its line of poles and wires, which negotiation was fruitless. Whereupon the telegraph company served the Western and Atlantic Railroad Company with written notice of its purpose to condemn, along its right of way in this State, a right of way upon which to construct (when necessary), maintain, and operate its telegraph line. "The location of the right of way sought to be acquired is substantially that location now occupied by the telegraph line of the Western Union Telegraph Company along main line of your railroad from Atlanta, Ga., to the Tennessee line at or near Graysville, Ga., and along the branch line known as the Rome branch," the main line running from Atlanta, Ga., to the Tennessee State line at or near Graysville,

Ga., through the counties of Fulton, Cobb, Bartow, Gordon, Whit-field, and Catoosa, a distance of approximately 121.37 miles. The telegraph line will enter upon the right of way of the railroad com-pany at the Marietta street bridge at the same point where it now enters upon the right of way, and continue upon the east side of the tracks a specified distance of about three miles, then to cross the tracks and continue on the west side, a specified distance, to a point north of the 5 mile post, then to cross the tracks and continue on the east side a specified distance to the 6 mile post, at which point the line would divide, and part of the line cross to the west side of the tracks. From the 6 mile post to the Tennessee State line the line would extend on both sides of the track as now located, except at Marietta, Adairsville, Dalton, and Tunnel Hill. The right of way thus sought to be acquired by the telegraph com-pany to be of sufficient width to enable it to conveniently construct (when necessary), maintain, and operate its line located and con-structed substantially as follows: as many wires or cables of wire as might be necessary from time to time to transact the business of the telegraph company, to be strung on poles placed at an aver-age distance from the centre of the main-line track of twenty-seven feet, "except where your right of way is limited or widened," with a minimum distance from edge of right of way (except where right of way is limited or widened) of six feet. Poles to have a length of not less than twenty feet, to be placed in the ground a depth of not less than four feet. At highways, railway crossings, depots, and side-tracks, poles to have a height of from twenty-five to forty feet above the ground, with an average of forty poles per mile on both sides of the track from Atlanta, Ga., to Kingston, Ga., and of thirty poles per mile from Kingston, Ga., to the Tennessee line. "Said poles will nowhere be placed upon any of the embankments or in the cuts of your railway, nor will said wires be attached or fastened to any of the bridges or trestle work of said railway." There will be wires crossing the tracks from the main telegraph line to reach the offices of the telegraph company at various points mentioned along the railroad; at all points where the wires so cross the tracks, the lowest wires to be not less than twenty-five feet above the tracks. The term for which the condem-nation was desired was the term expiring December 27, 1919, which date is the expiration of the railroad company's lease with the

State. Thereupon the Western and Atlantic Railroad Compar·· filed a petition to enjoin the proposed condemnation by the Western Union Telegraph Company. The telegraph company showed cause by demurrer and answer; and after hearing evidence the court refused an interlocutory injunction.

1. It is settled law in this State that a telegraph company, in the exercise of the right of eminent domain granted to it by the State, may condemn a right of way on and along the right of way of the railroad company when the proposed line of telegraph will be so constructed as to produce no material interference with the railroad company's free exercise of its franchise or with the actual operation of the road. Whether the construction of the telegraph line on a particular portion of the railroad's right of way will or will not materially interfere with the operation of the railroad is ordinarily a question of fact. *Savannah &c. Railway Co.* v. *Postal Telegraph Co.,* 112 *Ga.* 941 (38 S. E. 353).

2. The railroad company denies that a telegraph company possesses any power of condemnation without first filing with the railroad commission of this State its consent that the railroad commission shall have jurisdiction over it for the purpose of regulating tolls charged on long-distance messages originating and ending within the State of Georgia. Originally the railroad commission of Georgia had jurisdiction only over railroads. In 1891 its authority and jurisdiction were extended so as to embrace telegraph companies and express companies (Acts of 1890-1891, p. 151; Civil Code (1895), §§ 2217-2218). In 1894 an act was passed providing for the condemnation of private property for public uses by all corporations or persons authorized to take or damage private property for public purposes. Civil Code, § 5206 et seq. In 1898 the provisions of this act were made applicable to telegraph companies, Civil Code, § 5235. In 1905 section 2347 of the Code of 1895, which authorizes telegraph companies to construct, maintain, and operate telegraph lines through or over any lands of this State, and on, along, and upon the right of way and structures of any railroad, and, where necessary, under or over any private lands in this State, was so amended as to extend its provisions to telephone companies and to confer upon both telephone and telegraph companies the power of eminent domain; provided, that where it is necessary for such companies to exercise the right of eminent

domain, they shall proceed to exercise it in the same manner as heretofore provided by law for the exercise of such right of eminent domain by telegraph companies; and further provided, that no corporation shall have the benefit of this section until it has filed with the railroad commission of the State its consent that the railroad commission shall have jurisdiction over it for the purpose of regulating intrastate rates. Civil Code, § 2811. In 1907 the railroad commission of this State was expressly given jurisdiction over both telegraph and telephone companies for the regulation of their intrastate business. Civil Code, § 2662. The history of the legislation on this subject, as thus outlined, shows that telegraph companies were not originally under the jurisdiction of the railroad commission; that as soon as the commission was given jurisdiction over them, the power of eminent domain was conferred upon them; that telephone companies were not brought within the jurisdiction of the railroad commission until 1907; and that prior to that time telephone companies could not exercise the right of eminent domain without first voluntarily submitting to the jurisdiction of the commission. It would seem from a reference to the act of 1905 that so much of Civil Code section 2811 as requires a filing with the railroad commission of its consent to submit to its jurisdiction was applicable to telephone companies which did a purely telephone business or in conjunction therewith a telegraph business. The code section is a little confusing, but this confusion is dissipated by a reference to the act of 1905. Given this construction, the provision of section 2811, about filing a consent to submit to the jurisdiction of the railroad commission, is not applicable to telegraph companies. We therefore hold, that it is not prerequisite that a telegraph company, in the exercise of the right of eminent domain under the statute, shall first file with the railroad commission its consent to submit to its jurisdiction.

3. The telegraph company claims the right to condemn the railroad company's right of way on both, sides of the track. We have been unable to find any reported case dealing with the exact question. In solving this problem we must look to our statute to ascertain the extent of the power of condemnation which is given to telegraph companies. The act of 1894 (Civil Code, § 5206 et seq.) is a general statute defining the manner of the exercise of the right of condemnation by those entitled to take or injure private prop-

erty for public use upon making adequate compensation. It was specially made applicable to telegraph companies by amendment. Civil Code, § 5235. It is declared in section 5236 that "When a telegraph company undertakes to condemn so much of the right of way of a railroad company as may be necessary for its use for the purpose of constructing, maintaining, and operating its telegraph lines along and upon such right of way, the notice provided for in section 5218 of the Code shall be directed to the railroad company and shall set out the manner in which the telegraph company proposes to construct its lines on the right of way of the railroad company." This implies that a telegraph company can only take of the railroad's right of way so much thereof as may be necessary for the purpose of constructing, maintaining, and operating its lines of wire. Without such a limitation it would be in the power of a telegraph company with a monopolistic tendency to acquire, by condemnation proceedings, the right to occupy all of the right of way of a railroad company not required for railroad use, to the arbitrary exclusion of any other telegraph company that subsequently might wish to occupy a portion of the right of way, either with the consent of the railroad company or by virtue of the exercise of eminent domain. We are mindful of the case of *S., F. & W. Ry. Co.* v. *Postal Telegraph Co.,* supra, wherein it was ruled that "it is not essential that the telegraph company should affirmatively show that, in order to erect, maintain, and operate its telegraph lines between the points proposed, it is necessary for it to condemn such right of way; nor is it essential for it to show that it is necessary for it to use the particular portions of such right of way which it proposes to condemn." No case is broader than its facts; and the quotation which we take from the headnote in that decision, as illustrated by the discussion in the opinion, was not intended to cover the question in hand. In that case the telegraph company was only seeking to condemn a portion of the right of way on one side of the track, and there arose a controversy as to the right of the telegraph company to select that particular portion without showing a necessity for the location of its poles on the particular portion. And in that connection the court said: "In the very nature of things it would be impossible to show this; for a similar strip located almost anywhere else on the right of way, at a sufficient distance from the railroad track, might answer for the pur-

pose in view, and certainly numerous other locations for such a strip could be found upon the right of way." The court had in mind only one strip of land, and not two strips separated by the railroad track. And even where a single strip of the right of way is sought to be taken by the telegraph company, the telegraph company can not take more than may be necessary for its use for the purpose of constructing, maintaining, and operating its telegraph lines along and upon the railroad's right of way. If the corporation should attempt to take more land than is authorized, a court of equity will restrain it from so doing. *Savannah Railway Co.* v. *Postal Telegraph Co.,* 115 *Ga.* 554, 560 (42 S. E. 1). The condemnor has a large discretion in the selection of its route, but we do not understand that it was ever contemplated by the statute that a telegraph company could arbitrarily condemn both sides of a railroad track for the construction of lines of wires on both sides of the track, when the necessary wires could be strung upon poles erected on one side of the track.

4. It appeared from the evidence that the railroad company could not safely and expeditiously operate its cars and engines without the aid of a telegraph line; that the demands of a modern railway are such that a telegraph system is a necessary auxiliary to its safe and proper operation. In view of the telegraph company's voluntary termination of its contract with the railroad company, the latter is compelled to erect and maintain its own telegraph poles and wires, in order to operate its road by means of electrical signals and orders. The railroad company contends that it should have the right of prior selection in the location of a line of telegraph for railroad use, and that it intends to erect poles upon substantially the same locations as at present occupied by those of the telegraph company. On the other hand, the telegraph company denies that the railroad company has any such right, but asserts that it has the right to select a route over the railroad company's right of way at any point which does not materially interfere with the railroad company in the conduct of its business. These conflicting claims must be solved by the application of the rule that property dedicated to one public use can not be subjected to another public use, except in cases where the latter use does not materially interfere with the former. If the railroad company owned the existing line of telegraph, and it was necessary to main-

tain and have it for the safe and convenient handling of its trains and cars, no one would seriously contend that the telegraph company could deprive the railroad company of its use by virtue of the exercise of the right of eminent domain. Assuming, of course, the necessity of a line of telegraph as auxiliary to the operation of a railroad company, the railroad company would have the same right in locating its telegraph line as it would have in locating its railroad track, or its depot and its warehouses on its own right of way. If a railroad company was originally constructing its track, could it be said that a telegraph company could arbitrarily select sites for its poles so as to force the railroad company to build its track on a less desirable place on its own right of way? Surely not. The fundamental basis of the principle of subjecting one public use to a second public use is that the first use must not be materially interfered with. It would indeed be a most unfair demand to make of the owner of property charged with the discharge of a public duty, that he must make his property subservient to the convenience of the demandant who desires it for another public use. The railroad company is held off by its contract from constructing its line of telegraph on that portion of its right of way which it prefers, and which it has selected, until the contract expires; and the telegraph company should not be given a preference because it is not fettered by the same contract in proceeding to condemn the same portions of the railroad right of way. This conclusion can not be affected by the fact that the telegraph line was in existence at the execution of the lease. There was no exception, either in the leasing act or the contract of lease, that the lessee was to take the road burdened with a use by the telegraph company. The telegraph company recognizes that its right to occupy the right of way is contractual; hence its notice to the railroad company to terminate the contract, and its proceedings to acquire the right of occupancy by condemnation.

5. The telegraph company at present occupies with its poles and wires both sides of the railroad track for nearly the entire distance of the main line of the railroad. According to the evidence a single set of poles is sufficient to carry the necessary wires for a telegraph line for railroad use. It therefore can not be said that it is necessary that the railroad have a line on both sides of its track. But, as we have already said, the railroad company has the right of prior selection of the route.

6. The railroad company takes the position that the telegraph company has no power to condemn its usufructuary interest in the right of way without express permission of the State, and that, at all events, the State is a necessary party to the condemnation proceedings. The telegraph company contends that the State has expressly given its consent for any telegraph company to construct and maintain a line of telegraph upon the lands of the State. In support of this contention section 2811 of the Civil Code is cited. That section, after declaring that any chartered telegraph company shall have the right to construct and maintain its lines along and over the public highways of the State with the approval of the county or municipal authorities, proceeds as follows: "and, upon making due compensation, shall have the right to construct, maintain, and operate telegraph or telephone lines, or both, through or over any lands of this State, and on, along, and upon the right of way and structures of any railroads, and, where necessary, under or over any private lands in this State, and to that end may have and exercise the right of eminent domain." The quoted clause does not give to a telegraph company a free license to construct its lines over the lands belonging to this State. It expressly provides that "upon making due compensation" a telegraph company is given the right to construct its lines upon the lands of the State, upon the right of way of a railroad company, and upon private lands. The telegraph company's making due compensation is put forth as a condition precedent for the construction of its lines. This provision of the code places the land of the State upon the same plane as a railroad's right of way and land of private owners, with respect to condemnation. There is nothing in the language granting this concession which can be construed into a general permission to telegraph companies to build their lines upon the State's land without compensation.

In this State a tenant can neither assign his lease nor sublet the premises without the landlord's permission. Nor can a tenant who leases premises for a particular use devote them to other uses without the landlord's consent. *Dodd* v. *Ozburn,* 128 *Ga.* 380 (57 S. E. 701). Acquisition of the right of occupancy of land by means of condemnation is the equivalent of a conveyance. The difference consists in the means of acquiring the right; the former is involuntary and the latter is voluntary. If a tenant can not convey

the right to devote the premises to a use not authorized by the lease, it must follow that the right can not be acquired by condemnation. A telegraph line can only be constructed by an invasion of the premises of the landlord; and that can not be accomplished except by his voluntary consent, or by condemnation. It is true that if a tenant's possession be disturbed by the construction of a telegraph line, he is to be separately compensated for his injury, but it does not follow that separate condemnation proceedings may be taken against landlord and tenant. The relation of the State to the lessee of its railroad is that of landlord and tenant. The lessee has but a usufructuary interest in the possession of the leased premises, for the specific uses named therein. *State of Georgia* v. *Western and Atlantic Railroad Company,* 136 *Ga.* 619, 625 (71 S. E. 1055). Because of this relation any condemnation proceeding must be instituted jointly against the State and the lessee, unless the State gives to the telegraph company permission to occupy its railroad without condemnation, which it has not done.

Our attention is called to the provisions of the eminent-domain law respecting the right of a telegraph company to condemn the right of way of a railroad company, and especially to the provision that in such cases only the railroad company is to be notified. The argument is that the lessee is a railroad company, and therefore falls within all of the provisions of the statute on the subject. We do not think so. The statute refers to railroad companies which own their rights of way, the ownership extending either to the easement of right of way or to the fee in the soil. For reasons already stated, it is manifest that the statute does not contemplate proceedings solely to condemn the right of way of a railroad company which has no ownership of easement of the right of way or of the fee; one which is merely a tenant, possessing no estate, but only a usufructuary interest in the land.

7. Another objection to the telegraph company's right to condemn is its contractual stipulation with the American Telegraph Company and subsidiary companies, that the respective parties shall use in common, as far as practicable, the facilities of each other in order to avoid unnecessary duplication of lines and wires. This contract was made to cover large systems of telegraph and telephone companies; and it will not be imputed to the telegraph company

that it will attempt to impose an additional use not mentioned in the notice of condemnation. If the telegraph company undertakes to impose an additional servitude, the railroad company has its remedy against such an act. *Nolan* v. *Central Georgia Power Co.*, 134 *Ga.* 201, 210 (67 S. E. 656).

8. The railroad company further sets out that it is a common carrier engaged in interstate business; that if a portion of its right of way is condemned for the construction of a telegraph line, the danger of falling poles and other inconveniences would interfere with its traffic and would be a burden on interstate commerce. The deduction is sought to be drawn that the condemnation of the railroad's right of way is prohibited by that provision of the constitution of the United States giving to Congress the exclusive power to regulate commerce between the States. We fail to appreciate this objection. A telegraph company can not condemn any portion of a railroad's right of way necessary for the operation of its trains and cars. The possibility of poles falling upon the track is too remote a contingency to be considered. *Atlantic Coast Line Railroad Company* v. *Postal Telegraph-Cable Company*, 120 *Ga.* 268 (48 S. E. 15, 1 Ann. Cas. 734). The railroad is now being operated with a telegraph line on both sides of its track, and yet no complaint is made that existing conditions interfere with the railroad company in the discharge of its duties as a carrier of passengers and goods.

9. A further contention advanced by the railroad company in bar of the proposed condemnation of its right of way is that the eminent-domain laws of this State, as construed in *Atlantic Coast Line R. Co.* v. *Postal Telegraph-Cable Co.*, supra, authorizing condemnation of the right of way of a railroad company by a telegraph company, are unconstitutional, in that they allow the property of the railroad company to be taken without due process of law. In the case cited this court ruled, that the measure of damages in such cases is the value of the land actually taken, and the extent to which the use of the right of way by the railroad company is diminished by its use by the telegraph company; that the right of way of a railroad company has no general market value for other uses than that to which it is applied; and that peculiar advantages and benefits accruing to a telegraph company from its use of the railroad's right of way can not be considered in the assessment of

damages. The effect of this ruling is alleged to be that a railroad company is entitled to no more than nominal damages for the appropriation of a portion of its right of way under condemnation proceedings for the erection or maintenance of lines of poles and wires of a telegraph company, and hence it is not permitted to receive the full value of the property taken and the injury inflicted. The rule laid down for the measure of damages in 120 *Ga.* 268 (supra), is the correct rule, supported by reason and by authority. The measure of damages as there defined accords to the railroad company full compensation for the value of the land taken; and the statute providing for the condemnation of a railroad's right of way is not unconstitutional for the reason that the railroad company's property is taken without due process of law.

The case is reversed, and remanded for another hearing.

*Judgment reversed. All the Justices concur.*