Western Union Tel. Co. v. Railroad.

WESTERN UNION TELEGRAPH Co. *v.* NASHVILLE, C. &
ST. L. RY. Co. *et al.*

(*Jackson.*   April Term, 1915.)

1. **TELEGRAPHS AND TELEPHONES.** Extension of line.
Right to make.

A telegraph company was organized under New York act of April
12, 1848 (Laws 1848, ch. 265), providing that any number of
persons may associate for the purpose of constructing a line of
telegraph through the State from and to any point without the
State. New York act of April 8, 1851 (Laws 1851, ch. 98), re-
quired the written consent of persons owning two-thirds of the
capital stock of such companies as a condition to an extension
of the lines, while New York act of June 29, 1853 (Laws 1853,
ch. 471), provided for an extension of the lines upon the terms
and conditions prescribed in the act of 1848. *Held,* that after
the passage of the act of 1853, written consent of persons holding
two-thirds of the stock of such company was not necessary to
an extension of its line without the State. (*Post, pp.* 700-704.)

2. **EMINENT DOMAIN.** Telegraph and railway companies.
Right to condemn.

As Act Cong. July 24, 1866, chapter 230, section 1, 14 Stat. 221
(Rev. St. U. S. sec. 5263 [U. S. Comp. St. sec. 10072]), does
not confer upon telegraph companies the right to condemn an
easement over a railroad right of way, but merely denies the
State power to prevent an occupation and use of such right of
way for telegraph purposes, a telegraph company may, under
the State laws, condemn for telegraph purposes a way over a
railroad right of way. (*Post, pp.* 704, 705.)

Cases cited and approved: Western Union Tel. Co. v. Richmond,
224 U. S., 160; Western Union Tel. Co. v. Pennsylvania R. Co.,
195 U. S., 540; Louisville & N. R. Co. v. Western Union Tel. Co.,
207 Fed., 1; Western Atlantic R. Co. v. Western Union Tel. Co.,
138 Ga., 420.

3. **EMINENT DOMAIN.** Telegraph and railway. Ways. Condemnation.

A petition by a telegraph company for condemnation of a way for a line of telegraph along a railroad right of way, brought under Acts 1885, chapter 66, section 1, authorizing such condemnation, providing that the ordinary use of such railroad shall not be thereby obstructed, is not bad because the petition declared that the telegraph line would not obstruct the use of the right of way for railroad purposes, and offered to move the line in case the right of way should be obstructed. (*Post, pp.* 705-709.)

Acts cited and construed: Acts 1885, ch. 66, sec. 1; Acts 1885, ch. 135.

Cases cited and approved: Railroad Co. v. Telegraph Co., 101 Tenn., 62; C. & A. R. R. Co. v. Joliet, Lockport & Aurora Railway Co., 105 Ill., 388; Peoria & Pekin Union Ry. Co., 105 Ill., 110; Railroad v. S. W. Tel. Co., 121 Fed., 276; Railroad v. Postal Tel. Co., 173 Ill., 535; Railroad v. Post. Tel. Co., 76 Miss., 731.

Cases cited and distinguished: St. Louis, etc., R. Co. v. Postal Tel. Co., 173 Ill., 508; American Telephone Co. v. St. Louis, etc., R. Co., 202 Mo., 656.

4. **EMINENT DOMAIN.** Compensation. Right to.

As a telegraph company, upon condemning the right to erect a telegraph line on a railroad right of way is obligated to prevent its line from obstructing the use of the right of way for railroad purposes, Shannon's Code, secs. 1844-1859, providing for compensation in money, makes adequate provision for assessment of damages and allowance of compensation. (*Post, pp.* 709, 710.)

Code cited and construed: Secs. 1844-1859 (S.).

5. **EMINENT DOMAIN.** Proceedings. Selection of line.

Where a telegraph company condemns the right to build a line on a railroad right of way, the telegraph company, and not the railroad company, is entitled to select the site for the telegraph line, so long as it does not interfere with the operation of the railroad. (*Post, pp.* 710-716.)

Western Union Tel. Co. v. Railroad.

Cases cited and approved: Railroad v. Railroad, 116 Tenn., 500; Western & Atlantic Ry. Co. v. Western Union Tel. Co., 138 Ga., 420; Postal Tel. Co. v. Oregon, etc., R. Co. (C. C.), 104 Fed., 623; Union Pac. R. Co. v. Colorado Postal, etc., Co., 30 Colo., 133.

Cases cited and distinguished: American Telephone, etc., Co. v. St. Louis, etc., R. Co., 202 Mo., 656; Western Union Tel. Co. v. L. & N. R. Co. (D. C.), 201 Fed., 946; Louisville & N. R. Co. v. Western Union Tel. Co., 207 Fed., 1.

6. **EMINENT DOMAIN.** Proceedings. Compensation.

As a telegraph company may acquire the right to construct its line on a railroad right of way where it does not obstruct the operation of the railroad, but there may be an interference not amounting to an obstruction, the railroad company cannot be denied substantial damages, particularly where the taking will force it, in case it builds its own telegraph line, to adopt a less advantageous route, this being so though the telegraph company offered to remove its line in case it should be an obstruction, for a slight interference would not amount to an obstruction. (*Post, pp.* 716-719.)

Cases cited and approved: Railroad v. Tel. Co., 101 Tenn., 62; Cleveland, etc., R. Co. v. Ohio Postal Tel. Co., 68 Ohio St., 306; Atlantic, etc., R. Co. v. Postal Tel. Co., 120 Ga., 268; Mobile, etc., R. Co. v. Postal Tel. Co., 120 Ala., 21; W. U. T. Co. v. South, etc., R. Co., 184 Ala., 66; Mobile, etc., R. Co. v. Postal Tel. Co., 76 Miss., 731; Postal Tel. Co. v. Oregon, etc., R. Co. (Co. C.), 114. Fed., 787.

---

## FROM CARROLL.

---

Appeal from the Circuit Court of Carroll County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.— THOS. E. HARWOOD, Judge.

SHIELDS & CATES and COOPER & CLARK, for plaintiff.

CLAUDE WALLER, JOHN BELL KEEBLE, ED. T. SEAY, W. B. LAMB and PEELER & PEELER, for defendants.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

In February, 1912, the Western Union Telegraph Company, a body corporate under the laws of the State of New York, filed in the circuit court its petition for the condemnation of an easement or right of way over and along the railway rights of way owned, or occupied as lessee, by the Nashville, Chattanooga & St. Louis Railway in Carroll county, through which county run two divisions (the Nashville and the Paducah) of the lines of railway of that company. The Louisville & Nashville Railroad Company, as the owner and lessor of the Paducah division, was joined as a defendant, as were also certain others who had interests as trustees under trust deeds or mortgages executed by the two railway companies. For convenience all of the defendants will be referred to as "the railway" or "the railway company."

The Nashville division extends from Nashville Tennessee, to Hickman, Kentucky, embracing 24.95 miles in Carroll county. On that division the telegraph company at the time of the filing of its petition maintained, and for nearly fifty years prior thereto it had maintained, a telegraph line along the south side, which would be the left side (going towards Hickman) of the single track main line of railroad.

The Paducah division of the railway extends from Paducah, Kentucky, to Memphis, Tennessee, and embraces 26.4 miles in Carroll county.  The telegraph company, prior to the institution of the suit, had operated a line of telegraph on the east side of the single main line track of railroad—the left side, going towards Memphis.

. The tracks of the two divisions cross at Hollow Rock Junction in Carroll county.

The primary purpose of the petition of the telegraph company was to condemn an easement for its pole lines along or on the routes then occupied by the petitioner on the rights of way of the railway.  By stipulation in the record it appears that the widths of the rights of way on the Nashville division vary from sixty feet (the railway track being approximately in the center) to one hundred feet, though it further appears from the proof probable that at places the width is about two hundred feet.  The rights of way along the Paducah division are one hundred feet in total width, the track of the railway being in the center.

The existing line of the telegraph company varies in its distance from the railway's track, on the Nashville division, due to the topography of the right of way (as it exists after the construction of the track through cuts and on fills), but its average distance would seem to be about twenty-five feet south of the center of the track.  On the opposite or north side of the track, on that division, a telephone line has been constructed on the right of way of the railway, near

the margin of that portion of the same that is fenced, by a commercial telephone company. There is no telephone line on the right of way of the railway's Paducah division.

Although it seems that the telegraph company's line was constructed along the Nashville division right of way prior to that date, it appears that its legal *status* was defined by a contract entered into on April 1, 1867, which provided for the furnishing of a telegraphic service to the railway's predecessor in title. This contract was ratified and extended on August 1, 1878, and again on May 14, 1880.

On June 18, 1884, another contract was entered into by the telegraph company and the railway, defining the rights of the parties as respects both the Nashville and the Paducah divisions, the latter division not having come into existence until after the date of the contract of May 14, 1880. In the contract of 1884, it was provided that one wire was to be set apart by the telegraph company for the preferential use of the railway, and that if the railway should at any time require greater wire facilities, the telegraph company should furnish an additional wire at the cost price thereof upon its poles, or, in the alternative, that the railway might, at its own cost, string such additional wire upon the telegraph company's poles in such position as the telegraph company might direct. Incorporated in this contract was the following clause which, it seems, has led to a breach and bitter litiga-

tion in this and other States between the contracting parties:

"Upon the wires thus set apart for the preferential use of the railroad company, its business messages, the family and social messages of its officers and agents may be sent free between all points on its roads;" etc.

On June 27, 1911, the telegraph company wrote the railway, complaining of the extravagant use by the officers and agents of the railway of the above contract privilege, it being insisted that the service thus exacted on the defendants' systems during the year 1910 reached the value of $521,925. It was requested by the telegraph company that this be remedied by way of a modification of the contract. Failing to reach an agreement, the telegraph company, on August 17, 1912, gave notice that the contract would be terminated. Thereafter negotiations for the purchase by the telegraph company of an easement for its pole lines were commenced, but they proved unavailing. This litigation followed.

The petition for condemnation sets forth, among other things, that the petitioner proposes to so set its poles as not to interfere with any ditch, drain, culvert, or any work or structure of the railway or the ordinary travel upon or use of the railroad—
"and, in event it may be deemed by the railway necessary to change the location of its tracks, or to construct new tracks, or side tracks, or to construct new depots, or other buildings, or to change the location of

those now, or hereafter to be constructed by the defendant company, where any of the petitioner's poles and wires are located upon the said right of way, petitioner hereby agrees to remove its said poles and wires from said places or points so to be used to any part of defendant's right of way thereunto adjoining which may be designated by defendant company, upon due and reasonable notice in writing given to the petitioner by said defendant, setting forth the desired change; all of said changes, and relocation of its wires, to be made at the expense of the petitioner.''

The petition also embodied the consent of petitioner that the railway might take all earth materials and water needed by the latter, and its agreement to so reset, at its own expense, its poles as to conform to any consequent changes in the grade; to hold the railway harmless from any damages to petitioner's property; to hold down interference with the operation of cars or trains on any railway tracks, etc.

The circuit court adjudged that petitioner had a right to condemn, but denied it the location at the time held by its pole line along the Nashville division. That court assigned the telegraph company a different location, but on the same side of the track of that division, alongside the present line of the telegraph thus recognizing that there was adequate space on the right of way of that division for an additional or third pole line. The location for the telegraph pole line at the place at the time occupied by the same on the Paducah division was also denied, and the location was shifted

to the opposite side of the track. Substantial damages were denied and nominal damages awarded the railway.

On appeal the court of civil appeals modified the judgment of the circuit court in such way as to designate for the petitioner the locations by it sought on the two divisions, but affirmed the circuit court in other respects. That court incorporated the above recited petition stipulations, or agreements, on the part of the telegraph company, in its judgment as conditions binding on that company.

The railway has petitioned for and been granted by this court the writ of *certiorari* in order to a review of the judgment of the court of civil appeals; and, owing to the magnitude of the interests involved, in this and other States, the cause was set down for oral argument, and argued at the bar of this court. While the pending case directly affects the rights of the parties in but one county, the principles to be herein declared will govern in other suits brought, or to be brought, in other counties of this State to test the telegraph company's right to condemn easements over the rights of way of two of our largest railway systems.

The first question for solution, as one lying at the threshold of the lawsuit and determinative of all contentions, if the railway be correct in its position respecting it, is the power of the telegraph company under the terms of its charter, granted by the State

of New York, to own or operate telegraph lines in this State.

The railway undertakes the maintenance of the proposition that the telegraph company cannot condemn property in this State since it is not authorized by its charter to exercise any corporate function of ownership, except under a certain provision of its charter (which it is claimed has not been complied with), requiring, by way of condition precedent to any extension of its telegraph lines, the obtaining by the telegraph company of "the written consent of the persons owning two-thirds of the capital stock of such company."

The determination of this question depends upon the proper construction of certain acts of the general assembly of the State of New York.

The telegraph company was organized, under the name of New York and Mississippi Valley Printing Telegraph Company, on April 1, 1851, under the New York act of April 12, 1848, the first section of which provided:

"Sec. 1. Any number of persons may associate for the purpose of constructing a line of wires of telegraph through this State, and from and to any point within this State, upon such terms and conditions, and subject to the liabilities prescribed in this act." Laws 1848, chapter 265.

The certificate of incorporation set out, in pursuance of section 2 of the act, the general route of the line of telegraph to be:

"Through this State from the city of Buffalo to the State of Pennsylvania, along the south side of Lake Erie."

Both the railway and the telegraph company construe the above act of incorporation to provide only for the ownership of lines within the State of New York, and we think correctly so.

On April 8, 1851, the legislature of New York passed an act amending the act of 1848, so as to provide that the directors of telegraph companies incorporated thereunder—

"may, at any time, with the written consent of the persons owning two-thirds of the capital stock of such company, extend their line of telegraph, or may construct branch lines to connect with their main line, or may unite with any other incorporated telegraph company." Laws 1851, chapter 98.

This amendment, as will be noted, followed the incorporation of the telegraph company by one week, and its purpose evidently was to enable it to extend the originally designed line within the State of New York, touching which power the act of 1848 was silent.

The next act amending the act of 1848 was that of June 29, 1853, which, among other things, provided for the incorporation of any number of persons for the purpose of owning and maintaining lines of telegraph—

"whether wholly within, or partly beyond, the limits of this State  .  .  .  upon such terms and conditions, and subject to the liabilities prescribed in the act

passed April 12, 1848. . . . . And such association
shall, upon complying with the provisions of the said
act, . . . have the powers, and be subject to the
provisions in the said act, and in the several acts
amending the same, contained, not inconsistent here-
with.'' Laws 1853, chapter 471.

By this act there were affected only companies own-
ing lines wholly within or partly within and partly
beyond the limits of New York. Ownership and main-
tenance of lines wholly beyond the State of New York
yet remained to be dealt with. The development of
the idea of a great system of telegraphic communica-
tion seems to have come, as was natural, by gradual
stages, and the ''lines'' were conceived of as separate
units. The telegraph company accepted and complied
with the provisions of the act of 1853, and organized
thereunder, with route set forth as being from Buffalo,
N. Y., to Louisville, Ky., with a branch circuit to Lex-
ington, Ky.

The line of the telegraph company in this State
along the right of way of the railway appear to have
been constructed after the passage of New York act
of 1862, which provided in substance, that any tele-
graph company incorporated in that State might own
and maintain any line or lines not described in the
original certificate of organization, ''whether wholly
within or wholly or partly beyond the limits of this
State (New York).'' Laws 1862, chapter 425. Thus
for. the first time were there recognized and dealt with
lines that might be wholly without the State of New.

York; and by the act it was further stipulated that such acquisition should be "upon the terms and conditions prescribed in the act of 1848," and not, as in the preceding act of 1853, upon the conditions prescribed in the Act of 1848 and in the several acts amending the same.

We are therefore of opinion that, even if the provision as to the procurement of the written consent of two-thirds of the stockholders embodied in the act of 1851 were one concededly to be treated in any event as a condition precedent, it does not apply to the line now sought to be acquired in Tennessee, and that the act of 1862, as the applicable act, does not so require. This is true, whether the line be deemed a separate one or an extension of a route designated in the charter of the telegraph company. Several considerations lead us to this result: (a) We think it manifest that, as the development of communication by telegraph became rapid and so comprehensive as to give promise of a nation-wide expansion, the legislature of the State of New York did not see fit to further impose such a cumbersome condition on the growth of the enterprise beyond the borders of that State; (b) able and diligent counsel of the railway do not point out that any question as to the lack of such a power under the above legislative acts has been raised in the courts of New York; and (c) in no reported case outside of that State does it appear that any defendant railway company has ever so much as submitted the question for adjudication, and a number of warmly contested suits

between railway companies and this telegraph company, in respect of the latter's power to condemn, have been before the courts in recent years. A power thus exercised, unchallenged in that particular for fifty years, is not readily to be held ill based or nonexistent.

The next assignment of error for consideration in logical order is that, since both the railway and the telegraph company are subject to the act of Congress regulating post roads, there is no power on the part of the State to authorize the condemnation sought in this case, for that it would be an invasion of the exclusive control by the federal government over the subject-matter.

It is admitted, as it must be, that the act of Congress of 1866 (R. S. sec. 5263) does not confer upon the telegraph company the right to condemn an easement over a railway right of way. The purpose of that act was to deny to the States the power to prevent an occupation and use of such a right of way for telegraph purposes, and the power to condemn remains within State jurisdiction. *Western Union Telegraph Co.* v. *Richmond*, 224 U. S., 160, 32 Sup. Ct., 449, 56 L. Ed., 710; *Western Union Telegraph Co.* v. *Pennsylvania R. Co.*, 195 U. S., 540, 25 Sup. Ct., 133, 49 L. Ed., 312, 1 Ann. Cas., 517; *Louisville & N. R. Co.* v. *Western Union Telegraph Co.*, 207 Fed., 1, 124 C. C. A., 573; *Western Atlantic R. Co.* v. *Western Union Telegraph Co.*, 138 Ga., 420, 75 S. E., 471, 42 L. R. A. (N. S.), 225, and note.

No jurisdiction, therefore, is attempted to be asserted by the Congress, if it were competent for it to do so, over the particular matter of the power or mode of acquiring title that could be or become exclusive. The result of the railway's contention, if sustained, would be that there could be no condemnation by a telegraph company at all. There is no merit in the assignment of error.

It is a further contention of the railway that the petition for condemnation is unknown to the forms of law, in that it does not seek to have any definite òr fixed right of way condemned, but seeks, it is claimed, to have made a judicial contract between the petitioner and defendant, and that, too, for an ambulatory or shifting easement over the right of way of the railway.

By our Act 1885, chapter 66, section 1, it is provided that telegraph companies may construct and maintain a line of telegraph upon, along and parallel to any of the railroads of this State, "provided that the ordinary use of such railroad be not thereby obstructed," and provision is made for the condemnation of easements in the manner prescribed by law for the taking of private property for works of internal improvement. By act 1885, chapter 135, more specific reference was made to the Code sections, relating to the taking of property for public works, which in terms were extended so as to apply to condemnation by such companies.

The telegraph company, conceiving that it was incumbent on it to construct and hereafter maintain a line of telegraph on the railway right of way that would not materially "obstruct" the ordinary use of that right of way for railroad purposes, embodied in its petition for condemnation, as has been noted, a proposal and agreement on its part to shift the location of its line to any part of the defendant's right of way which may be designated by defendant railway in event of changes in the location of its tracks, depots, etc., now or hereafter to be constructed, and that the poles shall be reset to conform to changes in the grade and curvature of the railway's tracks, etc.

The argument of the railway is that only a fixed and permanent easement may be condemned under our Code provisions—one of specific, definite, and unchanging metes and bounds. However that may have been prior to the later acts (1885) above outlined, we are of opinion that those acts are to be construed to provide for a maintenance of the line of telegraph after condemnation in such a way as will not obstruct the railway's user, as that user may itself be a changing quantity, as time runs and railway traffic increases so as to call for additional facilities. This construction is one favorable to the railway, as we see it, and certainly it is conformable to the needs of commerce and the public weal, which both the railway and the telegraph company were created to serve.

Under this construction the terms set out and acceded to by the petitioner are not to be considered con-

tract terms.  They are not party imposed or court imposed, but law imposed.  Any subsequent shifting in the pole line is to be referred for basis to the statute's provision for the safeguarding of the railroad user. It does and will not depend upon the volition of the condemnor.  An easement for a telegraph line is to be condemned, subject to such noncontract provisions in favor of the railway.  To guarantee the observance of such terms by the petitioner, the petition sets them forth and judgment goes in accord.  Similar stipulations in the petition were recognized as proper and enforced, seemingly without question, and therefore without discussion, in *Railroad Co.* v. *Telegraph Co.,* 101 Tenn., 62, 46 S. W., 571.

The point has been ruled directly in other jurisdictions.  In *St. Louis, etc., R. Co.* v. *Postal Telegraph Co.,* 173 Ill., 508, 51 N. E., 382, the petition contained stipulations of similar character, and it was said:

"These allegations in the petition are in the nature of stipulations, to which the petitioner binds itself. Such stipulations have been held valid by the decisions of this court.  *Chicago & Alton Railroad Co.* v. *Joliet, Lockport & Aurora Railway Co.,* 105 Ill., 388 (44 Am. Rep., 799); *Peoria & Pekin Union Railway Co.,* 105 Ill., 110.  Indeed, section 2 of the act in regard to telegraph companies only authorizes such companies to construct lines of telegraph along and upon railroads, and to erect poles for supporting the insulators and wires of their lines, upon condition that such construction and erection are done 'in such manner and at such

points, as not to incommode the public use of the railroad.' It is a condition precedent to the erection of the telegraph line, that the public use of the railroad shall not be incommoded.''

In *American Telephone, etc. Co.* v. *St. Louis, etc., R. Co.,* 202 Mo., 656, 684, 101 S. W., 576, 584, it was said:

"It is next contended by defendant's counsel that the easement proposed to be acquired is so lacking in precision and definiteness as to render the proceeding void. They argue that the property to be appropriated must be definitely located and described in the petition and judgment. They say this requirement was disregarded in the case at bar. Is this so? We think not. . . .

"It has been well determined in the cases referred to that reservations, stipulations, promises, and limitations made and placed, as in this case, on the easement by the petition and the judgment may be likened to covenants running with land, and in such case as this run with the easement and are binding upon plaintiff company and its successors. *Railroad* v. *S. W. Tel. Co.,* 121 Fed., 276, 58 C. C. A., 198; *Railroad* v. *Postal Tel. Co.,* 173 Ill., 535, 50 N. E., 807, and cases cited; *Railroad* v. *Post. Tel. Co.,* 76 Miss., 731, 752, 26 South., 370, 45 L. R. A., 223.

"The statutory rule in section 1272, supra, limiting the right under the second appropriation to such use as shall not materially interfere with the uses impressed on the primary easement by law, seems to demand a flexibility in the petition and judgment

which will subserve the useful purpose constituting
the life of that statute; and the lack of definiteness
complained of by defendant is really but another name
for this flexibility. If hereafter defendant is obliged
by law or by an advance in the knowledge of railroad-
ing to install the block system or any other contrivance
or mechanism on its line as a protection to life and
property, the judgment should be so worded as to pre-
vent the poles and wires of plaintiff from interfering
with the use of such safety appliances in the future."

Obviously cases are not pertinent which hold that,
where real property of an ordinary owner is being
taken originally for a public use, it is erroneous for
the court, in the absence of statutory warrant, to stipu-
late that the party condemning shall do certain things
for the benefit of the owner and to make an award of
lessened damages to the owner accordingly. There
the taking is in nature unconditional—of a full user.

This being the case, the railway, on that basis, fur-
ther contends that the Code sections (Code, Shannon,
sections 1844-1859, inclusive) do not supply a proced-
ure for the ascertainment and allowance of just com-
pensation to the railway, and that the taking is in con-
sequence without constitutional warrant. Further,
that it is entitled to be paid damages in money, and not
to have such stipulations, promissory in character, sub-
stituted in whole or in part therefor.

We deemed this contention and its several phases
to be met substantially by what is said under the
assignment of error next above. The telegraph com-

pany does not pay in mere promises; it pays for the easement taken by it, burdened and qualified at the time of taking with the conditions imposed by the statute.

Another point, much stressed by the railway, is that it was erroneously denied by the court of civil appeals its claim of preferential right in the selection of the portion of its own right of way which it desires to use for the construction of a telegraph line with which to operate its railroad, that court having held that the first right of selection, for its telegraph line, was in the telegraph company.

In support of this insistence on error the railway first urges that it was in the use of the line now occupied by the telegraph poles when, and before, the petition for condemnation was filed, in that it owns one or more wires strung on same, and that this fact gives the preference sought by it. The poles, cross-arms and the other wires are, however, the property of the telegraph company, and the maintenance of the particular wires referred to for railway use was on the line as that of the latter company, so recognized by the railway for many years and throughout all transactions. The occupation prior to petition filed was, then, that of the petitioner company, and the use of two wires was, by contract permission, through or an incident to that occupation by means of the pole line.

In this attitude where lies the preferential right of selection of location on or after the filing of the petition for condemnation which designated for future

use by the petitioner the location of the line now in existence?

The attempt of the railway to make the selection of that identical route was some months subsequent to the filing of that petition.

When a railway company proceeds to condemn a right of way for its purposes, it is granted the right of preference as to the location of its right of way, over the owner of the soil. 2 Lewis, Eminent Domain (3d Ed.), secs. 460, 604; *Railroad* v. *Railroad,* 116 Tenn., 500, 532, 95 S. W., 1019.

By what process of reasoning may it be held to have also a preference when another is by the State granted the power of eminent domain in respect to a taking of an easement over the railway's right of way? In each instance there is a subjection of an estate and by the authority of the same power.

In the case of *American Telephone, etc., Co.* v. *St. Louis, etc., R. Co.,* supra, this language was used in relation to a like claim:

"Defendant may no more question the policy, the good taste and propriety of plaintiff's selection of that route for its poles and lines than could the original proprietors raise such issue with defendant when it selected the route for its railroad. When the legislature delegated to defendant the power of exercising the right of eminent domain in its own behalf, it granted to it by necessary implication (barring malice and fraud) the discretion of selecting its route; and when it granted to plaintiff the same right, it clothed

that right with the same attribute of discretion—provided always that when an easement for a public use is to be condemned in an existing easement for a public use, the new easement (not being superior to the former) ought not to destroy, or be materially detrimental to, the prior use."

In *Western Union Tel. Co.* v. *L. & N. R. Co.* (D. C.), 201 Fed., 946, 949, Evans, D. J., said:

"The suggestion that the defendant may want to devote the very part of its property which complainant seeks to condemn to the construction in the future of a telephone or telegraph line of its own was disposed of in an opinion recently delivered in the condemnation suit, where the defendant, in its answer, made a similar claim under section 1 of the Kentucky act, authorizing condemnations by telegraph companies. While for other reasons overruling a demurrer to a paragraph of the answer which, among other things, set up this claim, the court said that in doing so it by no means intended to intimate that it yielded to 'the defendant's contention that the defendant has the first right to choose what part of its right of way shall be taken by the plaintiff or a right to any preference in respect to what it may itself intend hereafter to use for its own telegraph or telephone lines. Our view rather is that no such right or preference exists. The last clause of section 1 of the act does not seem to confer any rights upon the defendant as to a nonexisting telegraph line. The peculiar conditions actually existing in this instance greatly emphasize the view

we take.  Indeed, there would seem to be no justice in allowing the defendant to exclude the plaintiff from keeping its own poles where they now are when the right of way it has had, and which it desires to hold, shall be fully paid for through this action.  The party seeking to condemn appears to be given the right to take what it ''desires,'' though this, of course, is subject to the other provisions of the act.  That is the object of the suit.  The statute does not require that its right to take shall be made subordinate to any purpose of the owner. . . .  The taking of one particular part of a thing may involve greater compensation, including greater damages, but it does not otherwise affect or control the right to take what the plaintiff desires.' ''

On appeal to the United States circuit court of appeals, sixth circuit, under the style of *Louisville & N. R. Co.* v. *Western Union Telegraph Co.,* 207 Fed., 1, 124 C. C. A., 573, the court, while declining to express its opinion upon the ultimate merits of this particular question on the ground that it was one for solution by the State courts of Kentucky, yet held that the United States district court had not improperly exercised its discretion in the matter of enjoining the railway company, and said:

''It is true that the supreme court of Georgia (construing, as we do, the language of the opinion in connection with the syllabus prepared by the court) has held that the telegraph company could not condemn lines on both sides of the railway tracks, and that it

is vested with no preference in the adoption of location, and that it should be enjoined from condemning a right of way selected in good faith by the railway company. See *Western & Atlantic Ry. Co.* v. *Western Union Telegraph Co.*, 138 Ga., 420, 75 S. E., 471, 42 L. R. A. (N. S.), 225. . . . That decision must be recognized as the law of Georgia, so far as it pertains to appellee's condemnation proceeding pending in that State. But we think it requires no modification of the injunction under review, because, first, appellee has no lines in Georgia on both sides of the railway tracks, and the district court in Kentucky condemnation proceedings took a different view of the question under the Kentucky statutes," etc.

If the ruling in the Georgia case may not fairly be confined within the limits indicated, it may be said to run counter to the trend of authority on this point. *Postal Telegraph Co.* v. *Oregon, etc., R. Co.* (C. C.), 104 Fed., 623, affirmed 111 Fed., 842, 49 C. C. A., 663; *Union Pacific R. Co.* v. *Colorado Postal, etc., Co.*, 30 Colo., 133, 69 Pac., 564, 97 Am. St. Rep., 106; 2 Lewis, Eminent Domain (3d Ed.), sec. 604.

We deem the true rule to be that property already dedicated to a public use is in this respect on the same plane as other property, provided there does not exist a condition that would prevent condemnation—an interference with the first public use by the second so material as to "obstruct" or seriously and extraordinarily impair the use for ordinary railway purposes,

including telegraphic communication by means of the railway's own line of wires.

If the interference goes to the extent of so obstructing the earlier use, the power to condemn is lacking; but the theory underlying our statute is that when the interference does not go that far, the inconvenience and impairment may be compensated for in damages and the taking for the second use permitted.

The circuit judge held against the defense raised by the railway to the effect that a pole line of the telegraph company placed on the right of way would not leave safe and suitable space for a line of telegraph for defendant's purposes, and the court of civil appeals ruled that "the portion of the right of way selected by the telegraph company in this case will not, as the proof shows, materially interfere with, or obstruct, the ordinary travel on this railroad," and the context shows that by this was meant that the ordinary use for all railroad purposes would not be interfered with materially. Without going into a discussion of the proof in detail, we are of opinion that this ruling was correct. Particularly do we think it demonstrated by the testimony adduced that the railway may, with reasonable safety and convenience, construct and maintain its own telegraph line on the Nashville division on that side of the main track where stands the poles of the line of the Cumberland Telephone Company, and on the Paducah division on the opposite side of the track from the line of petitioner.

The court of civil appeals further upheld the selection by the telegraph company of the lines for many years, and yet, by it maintained on the right of way of the two divisions of railway, where they are now located, and this ruling being in accord with the authorities as to the right of selection, above discussed, will not be interfered with.

This brings us to a consideration of whether the court of civil appeals was in error in its judgment awarding to the railway company only nominal damages for the easements thus appropriated. Although that court affirmed a similar ruling of the trial judge, it said in its opinion that "this, to us, has been the most troublesome question to determine," and two of the members of that learned court, Judges Wilson and Higgins, dissented from the ruling. We think the majority of that court was led to its conclusion (so far as the Nashville division is concerned) by a mistaken construction or application of the case of *Railroad* v. *Telegraph Co.*, 101 Tenn., 62, 46 S. W., 571. It was held in that case by this court, on the facts there appearing, that nominal damages were properly allowed in a case of appropriation of a telegraph line on a railroad right of way. But it was not meant to be held that as a matter of law in no event would the rule of substantial damages be applicable to such an appropriation. On the contrary it was there said:

"It is not insisted in this case that the use of the right of way, and construction of the telegraph line, will be any detriment or obstruction to the railroad,

but, on the contrary, it is shown that it would be a benefit and convenience.''

Recurring to what was said above in the discussion of the question of preferential right of selection, the law recognizes that there may be an interference with the railway's use of such a degree of materiality as to require compensation, though it fail to obstruct or supersede such earlier use. In other words the interference by the subsequent public use with the former use may be so slight as to indicate nominal damages, it may be material to the point of indicating substantial damages, and it may reach the degree of obstruction, with the result of a denial of condemnation to the telegraph company.

We think the facts of the present case bring it within the second class, so far as the line along the Nashville division is concerned, and that the lower court erred in the rulings that excluded testimony competent to show the injury and inconvenience to be suffered by the railway by reason of the interference to be occasioned by the pole lines on the easement of way of the telegraph company. *Cleveland, etc., R. Co.* v. *Ohio Postal Telegraph Co.,* 68 Ohio St., 306, 67 N. E., 890, 62 L. R. A., 941; *American Telephone, etc., Co.* v. *St. Louis, etc., Co.,* supra.

We are of the further view that it was competent for the railway to show, if it could, that the taking of the existing telegraph line on that divsion by the condemnor compels it, the railway, to construct a telegraph line, necessary to be built presently, in a loca-

tion (even when made at the next best place) less desirable and more expensive, as well as for it to show damages, if any, by way of direct nonobstructing interference of petitioner's line with the railroad user.

The argument of the telegraph company to the contrary is that a condition of its being allowed to take at all is that it shall remove or readjust its line when it shall become an interference; but this is not maintainable under our holding favorable to that company on another point, to the extent of defeating the allowance of substantial damages. The proof offered indicated that the telegraph line on the Nashville division will be at the outset an interference that will incommode and injure the defendant to a substantial degree. Only such proof as tends in this direction is meant to be here indicated to be competent, in relation to that line.

As to the line sought to be condemned along the Paducah division: Here there exists no telephone line on the side of the track opposite to the existing telegraph line, and the latter is so far from the track and from any telegraph line reasonably and practicably to be constructed by the railway that the ruling as to measurement of damages as nominal under the doctrine of the case of *Railroad* v. *Telegraph Co.,* 101 Tenn., 62, 46 S. W., 571, was in our opinion warranted. The rule of that case on this point has been approved in several other jurisdictions. *Atlantic, etc., R. Co.* v. *Postal Telegraph Co.,* 120 Ga., 268, 48 S. E., 15, 1 Ann.

Cas., 734; *Mobile, etc., R. Co.* v. *Postal Telegraph Co.,* 120 Ala., 21, 24 South., 408; *Western Union Telegraph Co.* v. *South, etc., R. Co.,* 184 Ala., 66, 62 South., 788; *Mobile, etc., R. Co.* v. *Postal Telegraph Co.,* 76 Miss., 731, 26 South, 370, 45 L. R. A., 223; *Postal Telegraph Co.* v. *Oregon, etc., R. Co.* (C. C.), 114 Fed., 787, and cases therein cited.

The assignment of errors, as shaped, does not call for rulings by us on specific offerings of evidence by the railway tending to show in detail how the railway will be damaged by petitioner's line on the Nashville division, and necessarily they have been dealt with broadly.

The circuit judge erred in giving the jury peremptory instructions to award nominal damages in so far as it is above shown; and the court of civil appeals erred on the same point. Reversed and remanded, for further proceedings in accord with the rulings embodied in this opinion.

The cost of the appeal will be paid by the telegraph company.