LOUISVILLE & N. R. CO. v. WESTERN UNION TELEGRAPH CO.

(Circuit Court of Appeals, Sixth Circuit.   April 2, 1918.)

No. 2952.

1. EMINENT DOMAIN ⊕47(3)—NECESSITY FOR APPROPRIATION.
  Acts 1898, c. 49 (Ky. St. § 4679c), authorizing telegraph companies to condemn easements over the rights of way of railroad companies, allows judgment only for so much land as may be necessary; therefore, as necessity ordinarily underlies the exercise of such right, it must be assumed that some measure or degree of necessity shall be shown before the right of condemnation matures.

2. EMINENT DOMAIN ⊕47(3)—NECESSITY OF TAKING—DETERMINATION.
  The question of the necessity of a taking is a legislative one, and the necessity cannot be declared by telegraph companies, asserting the right to condemn an easement over a railroad right of way pursuant to the Kentucky statutes.

3. EMINENT DOMAIN ⊕169—CONDEMNATION—CONDITIONS.
  Acts 1898, c. 49, § 1 (Ky. St. § 4679c, subd. 1), after providing for condemnation by telegraph companies of easements for their lines along the right of way of any railroad, declares that the posts, arms, insulators, and other fixtures of such telegraph lines shall be erected and maintained in such a manner as not to interfere with the ordinary travel and traffic on such railroads, or with any other telegraph line already constructed on the right of way. *Held*, that the provision cannot be regarded as intending to formulate a hard and fast condition precedent, which might forbid any condemnation, but must be deemed intended to describe and characterize the nature of the right and easement which is to be condemned and to impose a continuing limitation on that right.

4. EMINENT DOMAIN ⊕17(3)—CONDEMNATION—DEFENSES.
  In view of Acts 1898, c. 49, §§ 4, 5 (Ky. St. § 4679c, subds. 4, 5), respectively providing that the jury shall assess the value of the land taken, and other incidental damages, and that testimony as to the value of the land taken and all actual damages that will accrue in the diminution of the value of the remainder of the right of way shall be admitted, the above provisions as to the construction of telegraph lines do not forbid a condemnation, though some interference with the railroad right of way will result.

5. EMINENT DOMAIN ⊕138—DAMAGES—COMPUTATION.
  Under the provisions requiring payment of damages for the land actually taken and occupied and for the diminution of the value of the remainder. while there is a taking of the pole-occupied area in the sense that compensation must be made, yet, as the easement is subject to be shifted, the value of the land taken should be computed in terms of damage to the remainder of the right of way.

6. EMINENT DOMAIN ⊕321—CONDEMNATION—INTERESTS CONDEMNED.
  Under Acts 1898, c. 49 (Ky. St. § 4679c), authorizing telegraph companies to condemn easements over the right of way of a railroad and providing that the line shall be constructed in such manner as not to interfere with the ordinary use of the railroad, a telegraph company, condemning a way, takes it subject to the duty of moving its line if necessary for the convenient operation of the railroad, and in case of necessity of removing the same from the railroad right of way entirely, for in view of the topography of Kentucky it must be assumed that the Legislature contemplated that there would be considerable railroad improvements in the future.

7. EMINENT DOMAIN ⊕321—CONDEMNATION—REMOVAL OF EASEMENTS.
  Under Acts 1898, c. 49 (Ky. St. § 4679c), the question whether a telegraph company should remove its line from the easement condemned over

a railroad right of way, on account of the interference with the operation of the railroad company, should be determined in good faith by the railroad company as if the telegraph line were its own.

8. **EMINENT DOMAIN** ⊚⟿128(1)—**DAMAGES—REDUCTION.**
As a telegraph company, condemning an easement over a railroad right of way under Acts 1898, c. 49 (Ky. St. § 4679c), takes its easement subject to the duty of removing its line in case it is necessary to prevent interference with railroad operations, that fact should be taken into consideration in assessment of damages, and diminution of damages cannot be avoided on the ground that the offer of the telegraph company to so take its line was promissory only.

9. **EMINENT DOMAIN** ⊚⟿120—**RAILROAD RIGHT OF WAY—NEW USE—"RAILROAD PURPOSE."**
The use by a railroad company of its right of way for construction and maintenance of its own telegraph, telephone, and electric signal lines is one for a railroad purpose, as modern railways cannot operate without such contrivances.
[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Railroad Purposes.]

10. **EMINENT DOMAIN** ⊚⟿108—**CONDEMNATION—DAMAGES.**
Where a telegraph company, under Acts 1898, c. 49 (Ky. St. § 4679c), condemns an easement over a railroad right of way for its telegraph line, the railroad company is entitled to damages for any interference with its own telegraph lines, as use of right of way for a railroad telegraph line is one for railroad purposes.

11. **EMINENT DOMAIN** ⊚⟿108—**CONDEMNATION—DAMAGES.**
Where a telegraph company, which under a contract with a railroad company constructed a line on its right of way, abrogated the contract and secured an order restraining the railroad company from removing the telegraph line, the railroad company is, on condemnation proceedings under Acts 1898, c. 49 (Ky. St. § 4679c), entitled to compensation for additional expense, past and future, because it was forced to construct its own railroad telegraph line on a less advantageous part of the right of way.

12. **EMINENT DOMAIN** ⊚⟿128(1)—**CONDEMNATION—NOMINAL DAMAGES.**
Where a telegraph company, condemning an easement over a railroad right of way under Acts 1898, c. 49 (Ky. St. § 4679c), obtained the most advantageous route for placing its line as a result of litigation following the termination of a contract between the companies, whereby the telegraph company had constructed a line on the right of way, the railroad company is not restricted to nominal damages, on the theory that the easement was ambulatory.

13. **EMINENT DOMAIN** ⊚⟿108—**CONDEMNATION—ELEMENTS.**
In a proceeding by a telegraph company to condemn an easement for its line over a railroad right of way pursuant to Ky. St. § 4679c, the elements of damage, consisting of all the diminution in the value of the use of the remainder of the right of way and expenses to which the railroad company might be subjected, stated.

14. **EMINENT DOMAIN** ⊚⟿207—**DAMAGES—AWARDING.**
On condemnation by a telegraph company under Ky. St. § 4679c, of an easement over a railroad right of way, the damages should be awarded as a unit.

15. **EVIDENCE** ⊚⟿533—**EXPERT OPINION—DAMAGES.**
In a proceeding by a telegraph company to condemn an easement over a railroad right of way, where the question of damages depended on the diminution in value of the remainder of the right of way for railroad purposes, railroad men, familiar with the cost and effect of every operation which might be involved, are competent to testify to the damage, as

⊚⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

are telegraph men, familiar with construction and maintenance problems, so far as their knowledge extends; this being so, though such witnesses did not know the market value of the land occupied by the telegraph line.

16. EMINENT DOMAIN ☞232—STATUTES—CONSTRUCTION—VIEW.

Acts 1898, c. 49 (Ky. St. § 4679c), providing for condemnation by telegraph companies of easements over railroad rights of way, which declares that the jury shall not be required to go upon or view such right of way, is not open to attack on the ground that a view of the property was not permitted, but that question must be deemed to have been left to the discretion of the court.

17. STATUTES ☞112—TITLE—SUFFICIENCY.

Acts 1898, c. 49 (Ky. St. § 4679c), entitled "An act giving effect to so much of section one hundred and ninety-nine of the Constitution * * * as provides for the right to construct and maintain lines of telegraph within the state," and which authorizes telegraph companies to condemn rights of way, is not subject to attack on the ground that the condemnation provisions were not expressed in its title.

18. CONSTITUTIONAL LAW ☞42—OBJECTIONS—PERSONS ENTITLED TO URGE.

The contention that Acts 1898, c. 49 (Ky. St. § 4679c), authorizing condemnation by telegraph companies of easements over railroad rights of way, is invalid because of the provision that no notice need be given any mortgagee, cannot be urged by a railroad company, for one not injured cannot question the constitutionality of a law.

19. EMINENT DOMAIN ☞262(5)—REVIEW—HARMLESS ERROR.

Where it would have been the duty of the court to have directed a verdict on an issue in a condemnation proceeding, the refusal of the court to submit that issue to the jury was harmless, though erroneous.

20. JURY ☞19(11)—PROCEEDINGS—JURY TRIAL.

As it is evident, from a consideration of sections 4 and 6, prescribing forms for the oath and verdict, that Act Ky. 1898, c. 49 (Ky. St. § 4679c, subds. 4, 6), relating to condemnation by telegraph companies of easements for their lines along the right of way of any railroad, contemplates that the question of necessity and similar precedent conditions shall be decided by the court in advance, or separate from the jury trial concerning compensation, the fact that the proceeding is deemed an action at law, within Rev. St. U. S. § 566 (Comp. St. 1916, § 1583), for some purposes, does not, where condemnation proceedings under the statute are brought in the federal court, warrant jury trial on the question of necessity of the condemnation.

Knappen, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Petition by the Western Union Telegraph Company against the Louisville & Nashville Railroad Company. There was a judgment of condemnation, assessing damages, and defendant brings error. Reversed and remanded.

Henry L. Stone, Edward S. Jouett, and Helm Bruce, all of Louisville, Ky., for plaintiff in error.

A. P. Humphrey and A. E. Richards, both of Louisville, Ky. (Rush Taggart and Albert T. Benedict, both of New York City, and Richards & Harris and Humphrey, Middleton & Humphrey, all of Louisville, Ky., of counsel), for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and KILLITS, District Judge.

DENISON, Circuit Judge. The facts which led up to the present controversy are sufficiently detailed in our opinion in Louisville, etc., R. R. v. Western Union Co., 207 Fed. 1, 124 C. C. A. 573. Following out the theory upon which the telegraph company was there held entitled to a restraining order, it instituted, in the court below, a condemnation proceeding against the railroad company, for the purpose of acquiring the right to maintain its line in the position it was already occupying upon and along the railway grounds. The line along the right of way thus sought to be condemned, and lying in Kentucky, was about 1,000 miles long. There having been a preliminary determination by the court that the necessary precedent conditions existed, there was a trial before a jury as to the amount of damages, which resulted in a directed verdict for $5,000. Treating the whole proceeding as a trial at common law, the railroad company brings this writ of error. The assignments are ample to raise every existing question. .

The disposition of many of the questions presented depends upon the construction and interpretation of the Kentucky statute (Acts 1898, c. 49 [Ky. St. § 4679c]), the pertinent parts of which we reproduce in the margin.[1] In that construction—so far as concerns most of the questions—we have no help from any decisions of the Kentucky Court

[1] An act giving effect to so much of section 199 of the Constitution as provides for the right to construct and maintain lines of telegraph within the state. (March 19, 1898.)

Sec. 4679c. 1. *Right of to Erect and Operate Lines.* That a telegraph company chartered or incorporated by the laws of this or any other state, shall, upon making just compensation, as hereafter provided, have the right to construct, maintain and operate telegraph lines through any public lands of this state, and on, across or along all highways and turnpikes, and across and under any navigable waters, and on, along and upon the right of way and structure of any railroad in this state: Provided, that the posts, arms, insulators, and other fixtures of such telegraph lines be erected and maintained in the usual manner of constructing, operating and maintaining telegraph lines on or along and upon the right of way of railroads, and on, across and along the highways, and across and under navigable waters, and in such manner as not to interfere with the ordinary use or the ordinary travel and traffic on such highways, railroads or waters, or that of any other telegraph line already constructed on the right of way of any railroad.

*    *    *    *    *    *    *    *    *    *

3. *Petition for Condemnation Proceedings may be Filed.* That in case any telegraph company having the rights and privileges herein granted is unable to agree with such railroad or turnpike company for the exercise of such rights and privileges, such telegraph company may file its petition, sworn to by its agent, in the office of the clerk of the county court of any county in which any portion of such railroad or turnpike is situated or may run, and one proceeding shall be sufficient to condemn the right of way herein provided for of any railroad or turnpike in this state. Said petition shall designate the railroad or turnpike as the case may be, and the particular use, right, easement or privilege sought to be condemned, and shall state the name of the petitioner, where incorporated, how, and in what manner, and with what kind of material it proposes to construct its telegraph line, and that it has complied with the Constitution of this commonwealth in regard to such corporations seeking to exercise right of eminent domain.

*    *    *    *    *    *    *    *    *    *

4. *    *    * A jury of twelve shall be impaneled, who shall be sworn by the clerk or judge of said court, as follows: "I do solemnly swear that as a mem-

of Appeals. The statute has been before the Kentucky court of last resort only twice, and then not upon matters of general construction. We therefore seek to ascertain the meaning, according to what seem to us the necessary inferences from the language used and from common knowledge of the situation involved, and from that viewpoint consider other decisions as far as they seem pertinent.

[1, 2] 1. This statute gives the right of eminent domain. A necessity for taking ordinarily underlies the exercise of such right, and statutes sometimes direct how that necessity shall be determined. See Lewis on Eminent Domain (3d Ed.) §§ 595–600. This statute contains no such direction, nor does it expressly require the judicial determination of any such general condition precedent. Clearly, however, there might be circumstances which would make the exercise of the right so unreasonable and arbitrary that we could hardly suppose the Legislature intended to permit it; and section 7 expressly contemplates that only so much shall be taken as is necessary. We think it safe to assume that some measure or degree of necessity must be shown or be presumed to exist before the right of condemnation matures. The telegraph company does not possess any fraction of the state's legislative power, and does not have power itself to declare a necessity, be-

ber of this jury, I will a true verdict render in this cause, assessing for the defendant the actual cash value of so much of its land as may be shown by the proof will be actually taken and occupied by the petitioner, and such other incidental damages, if any, as shown by the proof will accrue to the remainder of the right of way for the purpose for which it is held by the defendant, by reason of the construction of petitioner's telegraph line in the manner set out in the petition, so help me God."

5. *Evidence That may be Introduced—Measure of Damages.* That the court shall admit any relevant testimony either party may offer to prove the cash market value of the land that will be taken and occupied by the petitioner, and all actual damages that will accrue to the defendant in the diminution of the value of the remainder of its right of way for railroad or turnpike purposes, as the case may be, by reason of the construction of the telegraph line upon such right of way in the manner set out in the petition, and in considering incidental damages to the defendant, they may take into consideration any advantages that may accrue to the defendant as shown by the proof, by reason of the construction of such telegraph line.

6. *Verdict, Form of.* The jury shall not be required to go upon or view such right of way, and shall return their verdict on the form following: "We, the jury, assess the damages and just compensation to be paid ...... by the ...... to be dollars ......;" and the form of the verdict may be given the jury by the court.

7. *Judgment, Form of.* * * * "Now upon payment of said award either to the defendant or to the clerk of this court, and all costs in this behalf expended, said ...... telegraph company may enter upon said land and appropriate so much thereof as may be necessary, as prayed for in its petition."

* * * * * * * * * *

9. *Mortgagee need not be Notified—Proceeding if Mortgage on Land Condemned.* That no notice of the condemnation proceedings herein provided for, shall be given to any mortgagee of the defendant, but in the event there be any mortgage recorded in the county where such proceedings are had, upon the property condemned, then the damages and compensation awarded by the jury shall be paid to the clerk of said court, whose duty it shall be forthwith to mail written notice of such proceedings, and of said award, to the mortgagee or trustee named in said mortgage, who may contest with the said defendant for the same, if he sees fit to do so.

cause a legislative body may do so. See Sears v. Akron (March 4, 1918) 246 U. S. 242, 38 Sup. Ct. 245, 62 L. Ed. ——.

[3] 2. Embodied in the first section, and so perhaps to be considered as a condition of the grant, are these words (selecting only those now important):

"Provided, that the posts, arms, insulators, and other fixtures of such telegraph lines be erected and maintained in the usual manner of constructing, operating and maintaining telegraph lines on or along and upon the right of way of railroads * * * and in such manner as not to interfere with the ordinary use or the ordinary travel and traffic on such * * * railroads."

The telegraph line must be erected, operated, and maintained in the usual manner, and must not interfere with the ordinary use of, or traffic on, the railroad. We cannot regard this proviso as intending to formulate a hard and fast condition precedent which might prevent any condemnation, and this for three reasons: The first is that in the ordinary and typical case which the Legislature must have had in mind no such broad issue could arise. In almost any supposable situation (save in exceptional spots) a telegraph line could always be constructed and maintained in some suitable place along the railroad right of way, without constituting such an interference with the use of the property for railroad purposes as the Legislature could reasonably consider sufficient to prevent condemning at all. The second reason is that the provision as to maintenance cannot be a condition precedent to condemnation, and yet it is put precisely on a par with the condition as to construction, "be erected and maintained," and hence the provision as to the erection cannot be a general condition precedent. The third is that the language is not conditional in form. It is not "provided that the * * * lines" can be erected, etc.; it is an affirmative requirement that, if built, they "be erected and maintained," etc.

In our judgment the rare instances—if there are any—where interference with railroad use will be so inevitable, so extensive and so serious as to forbid condemnation at all only present a phase of "necessity"; and this proviso is intended to describe and characterize the nature of the right and easement which are to be condemned. The right to erect the poles and wires is given, but they must be so put up at the beginning, and always so maintained, as not to constitute the forbidden interference with ordinary use. The provision expresses, not a condition precedent, but a condition constant—a continuing limitation.

[4] 3. It is no part of the condition or limitation that the telegraph line shall not interfere at all with railroad uses and purposes; such a thought would be contrary to common knowledge and observation. No telegraph lines can be erected and maintained on a railroad right of way without interfering in some measure or degree with some of the uses to which the railroad may rightfully wish to put the occupied property.[2] To say that any such incomplete and partial in-

---

[2] Though a case may be conceived where the interference is so negligible as not to justify damages.

terference was contemplated by the proviso as a condition or limitation precedent would be to defeat the whole object of the statute, by providing that the condemnation and use should not occur except under conditions that never exist. Nor does the literalness of the language require any such sweeping view. It speaks of interference with "ordinary" use or traffic; it makes no reference to the supplementary uses which are rightful and sometimes necessary.

In this connection, it must be observed that section 4, with reference to the oath of the jury, and section 5, regulating the evidence, expressly provide that the railroad shall have, not only the value of the land to be taken and occupied, but such damages as "will accrue to the defendant in the diminution of the value of the remainder of its right of way for railroad * * * purposes." It is plainly inconsistent with this damage-defining provision to suppose that there can be no condemnation unless it has first been determined that there will be no impairment of the use of the remainder of the property for railroad purposes. We think the conclusion inevitable that the statute, taking its various parts together, has reference to two kinds or degrees of interference with such use of the property, and that only when the interference is so inevitable and so extreme as to seriously hamper ordinary use and traffic on the railroad is it intended that the condemnation proceedings should be dismissed, in whole or in part, for that reason.

It is well recognized that this "interference" may be insufficient to forbid condemnation and yet sufficient to justify damages. In Louisville Co. v. Western Union Co., 184 Ind. 531, 534, 111 N. E. 802, 803, Ann. Cas. 1917C, 628, the Supreme Court of Indiana considered—

"when such interference passes the stage where it may be compensated in damages and becomes so substantial and material as to preclude the right of * * * appropriation."

In applying a generally similar statute,[3] the Supreme Court of Tennessee, in Western Union Co. v. Railroad Co., 133 Tenn. 69, 714, 182 S. W. 254, 260, said:

"We deem the true rule to be that property already dedicated to a public use is in this respect on the same plane as other property, provided there does not exist a condition that would prevent condemnation—an interference with the first public use by the second so material as to 'obstruct' or seriously and extraordinarily impair the use for ordinary railway purposes, including telegraphic communication by means of the railway's own line of wires.

"If the interference goes to the extent of so obstructing the earlier use, the power to condemn is lacking; but the theory underlying our statute is that when the interference does not go that far, the inconvenience and impairment may be compensated for in damages and the taking for the second use permitted."

[5] 4. The damages to be recovered are for the land actually taken and occupied, and for the diminution of the value of the remainder. In the ordinary sense of most condemnations, no land is here "actual-

---

[3] The Tennessee statute uses the word "obstruct"; but "interfere with" and "obstruct" are in this situation essentially synonymous.

ly taken and occupied"; but the language is adopted from the familiar situation where it is more accurate. The total area upon which the poles and guy wire posts stand is negligible—perhaps two acres for the thousand miles—and the strip of land overhung by the cross-arms and wires is not appropriated in any exclusive way. "Taking" doubtless there is of this pole-occupied area and of this strip, in the sense that compensation must be made pursuant to the constitutional mandate; but when we find that even this "taking" is not specifically permanent, but is subject to be shifted to other positions (as we hereafter point out), we are unable to see any substantial distinction, as to compensation basis, between the land "actually taken" and the diminution of the remainder. It is impossible to know the value of what is "taken" in this qualified sense, except by measuring that value in terms of damage to the remainder. In its entirety, there is disclosed only the imposition of a shifting easement (in gross) upon a servient estate, involving the exclusive and permanent appropriation of no substantial body of property, but only lessening the value of the servient estate to its owner; and a distinction, created prima facie by the statute, between the taking of the one and the diminution of the other, is an artificial and unsatisfactory basis for assessing compensation.

Postal Co. v. Patton, 153 Ky. 187, 154 S. W. 1073, is not inconsistent with this conclusion. The Kentucky Court of Appeals had there a case where the facts permitted the full application of the statutory theory that there is a real taking of part of the property, and where, therefore, it was necessary to describe with certainty the property to be taken. That was the case of a telephone line constructed across farm lands, and the owner of the farm was deprived of his ordinary use of the entire width of the strip, which must be subject to travel and use for repair and maintenance. Upon this strip he could not safely plant crops in the ordinary way. The differences are obvious between that situation and one where the telegraph line is and continues to be subject to the right of the owner of the servant estate to use his property for its primary purpose. What is said in this paragraph is not intended necessarily to deny that the right or easement condemned may be part of the statutory "land actually taken and occupied" and may have an independent value because capable of sale or lease. The record does not present this question in any concrete way.

[6] 5. Considering, not only the language of the statute, but the familiar elements of the situation to which it referred, we must infer that there was no intent to give the telegraph company a permanent specific location, from which it could not be thereafter removed, except by a cross-condemnation proceeding—if at all. It was as well understood in 1898 as it is to-day that the necessary use of a railroad right of way for railroad purposes at any selected place was subject to constant development and increase. Changes of the roadbed in order to lessen the gradients always had been possible and were coming to be very common. They involve excavations and fills. Much of the Kentucky railroads is through rough and mountainous coun-

try, and vast amounts of such work must have been anticipated. Double-tracking upon trunk lines to meet increasing traffic was known to be necessary. It would often involve removing any telegraph line close to the previously existing single track. Much of Kentucky's railroad system consisted of trunk lines; and the Legislature could not have overlooked the obvious fact that the permanent maintenance of a telegraph line in any particular location upon a railroad right of way might forever bar the reasonably necessary excavation, regrading, double-tracking, signals, switch tracks, terminals or other proper uses by the railroad of its own property; nor could the Legislature have intended that the telegraph company must pay the enormous damages which alone could rightly compensate the railroad company for the permanent deprivation of these rights. We then find written into this statute the specific direction that the line shall be "erected and maintained" in such a manner as not to interfere with the ordinary use of the property for railroad traffic. No exigency of construction requires us to think that the probable uses which we have just specified and other similar ones were not among the ordinary uses in contemplation of the Legislature. We think this statute was passed and its language chosen in view of the well-known situation, and that a reasonable construction of the statute requires it to be interpreted as providing that the right taken by condemnation is one which must be exercised by original location where it will least interfere with railroad uses and which is burdened by a future liability to move to other parts of the right of way, if such moving becomes reasonably necessary to avoid the forbidden interference. In saying this, and in referring elsewhere in this opinion to the burden of removal resting upon the telegraph company, we refer only to a removal to some other location within the limits of the right of way. Such apparent necessity as might develop for removal entirely outside of those limits—if such a case may be supposed—involves a contingency which we do not consider.

[7] Such a construction of the statute and the mutual rights and duties thereby created present no greater practical difficulties than are common in some other relationships. The standard of good faith is a simple one, and what the railway company would do if the telegraph line were its own is the measure of that standard. In such case, if the telegraph line were in the way of some desired use, the railway company would balance the trouble and expense of transferring the line against the reasons in favor of the transfer, and would decide accordingly. So, when the wire line belongs to the telegraph company, and the railroad desires to use the space on or above the ground for other purposes. The reasonable convenience of both parties must be balanced; an arbitrary decision may not compel nor prevent a transfer. If there were otherwise difficulty about holding that telegraph company's location was subject to possible shifting rather than permanently fixed, that difficulty would be here removed, because neither party can complain of this conclusion. It favors the railroad company, and the telegraph company has, by its petition, consented.

[8] 6. The railroad company objects to those provisions in the petition and in the judgment which provide for the future moving of. the telegraph line to meet future railroad necessities, and its objection is that these are promissory stipulations, which have no place in the proceeding, and which cannot operate to reduce the damages to be awarded, because the performance of these stipulations will be, in a practical sense, largely at the will of the promisor. In the ordinary condemnation, where an exclusive possession is to be awarded to the condemnor, it may well be that such promissory stipulations cannot control the damages, and the same result has been reached even in the condemnation of a telegraph line over a railroad right of way. Louisville Co. v. Western Union Co. 184 Ind. 531, 111 N. E. 802, 803, Ann. Cas. 1917C, 628. However, we construe this statute as intending that the easement condemned shall be an easement subject to these limitations. It is not important that the telegraph company makes a promise to remove its line; when the event occurs which makes moving necessary, the right to maintain this line in the former location ceases; the judgment of the court formulating this limitation may, and in the public interest should, prescribe the method by which the reasonable right of the telegraph company to move its line in its own way and at its own expense may be preserved; but the controlling principle is that ultimately the right further to maintain the line in the first location expires and the railroad company may remove it. From this point of view, it is clear that the objection of the railroad company against being subject to promissory stipulations must fail. In adopting this view, we concur with the Supreme Court of Tennessee in saying, as it did, in 133 Tenn. 691, at pages 706 and 707, 182 S. W. 254, 258:

"Under this construction the terms set out and acceded to by the petitioner are not to be considered contract terms. They are not party-imposed, or court-imposed, but law-imposed. Any subsequent shifting in the pole line is to be referred for basis to the statute's provision for the safeguarding of the railroad user. It does not and will not depend upon the volition of the condemnor. An easement for a telegraph line is to be condemned, subject to such non-contract provisions in favor of the railway. To guarantee the observance of such terms by the petitioner, the petition sets them forth and judgment goes in accord."

The same conclusion has been reached in other cases, though with more dependence upon the form of the petition than we should be inclined to approve. See St. Louis Co. v. Postal Co., 173 Ill. 508, 535, 51 N. E. 382; American Co. v. St. Louis Co., 202 Mo. 656, 101 S. W. 576.

[9-11] 7. The diminution in the value of the right of way for railroad purposes is to be assessed. It is clear to us that the use by a railroad of its right of way for constructing and maintaining its own telegraph, telephone and electric signal lines, is use for a "railroad purpose"; indeed, we do not find, in the elaborate briefs of counsel for the telegraph company, any denial of this proposition. The railroad orders are transmitted by telegraph and by telephone, block and other distance signals are controlled through the use of electric currents passing over the wires, and, as matters were in

1898 and are now, a railroad can no more operate without a tele-graph, telephone, and electric signal system than it can without tracks or cars. Com. v. Louisville Co., 164 Ky. 818, 832, 176 S. W. 375; Western Union Co. v. Nashville Co., 133 Tenn. 691, 718, 182 S. W. 254.

It necessarily follows that, for such interference as the condemna-tion causes to the use by the railroad company of its right of way for its own wire line, the condemnor must pay damages; and since any absolutely necessary use is an ordinary use, it also follows that the line condemned must be originally located where it will cause the minimum of interference with railroad use of the property for its own telegraph line.[4]

This is the principle which seemingly must control such condemna-tion proceedings in cases where the railway company has selected its location and built its line and in cases where there is no telegraph line along the right of way, but the railway company is about to build. Under such circumstances there is strong support for the "preferential right" contended for by the railroad and upheld by the Georgia courts. Western & Atlantic Co. v. Western Union Co., 138 Ga. 420, 427, 75 S. E. 471, 42 L. R. A. (N. S.) 225; Louis-ville Co. v. Western Union Co., 142 Ga. 531, 83 S. E. 126. Nor do we think any difference in the result necessarily follows from the fact that the existing line was built by the telegraph company through arrangement with the railroad company for a joint use under a con-tract by which the railroad company, in substance, leased the right of way to the telegraph company and the telegraph company paid its rent by telegraph service rendered. When such a contract ex-pires by the election of the telegraph company (as here occurred), it is not easy to see why its rights, when it is driven to condemna-tion, are any greater because it formerly had a lease. See Western, etc., Co. v. Western Union Co., 138 Ga. 420, 75 S. E. 471, 42 L. R. A. (N. S.) 225. In this case, when its line was built, there was no statute for condemnation, and the line must have been erected under the expectation that at the expiration of the lease the telegraph com-pany, failing in a new contract, would get off. While these appear to be the applicable principles, we do not need to pass upon them in any absolute way. A peculiar condition has here arisen, and it must be met according to the facts as they are. In the years which have passed since this controversy arose, the railroad company has built its own line for a great part of the Kentucky distance now involved—perhaps now the greater part of the more important lines. This line is complete and performs all the service needed by the railroad in its railroad operations. It consists of a line of poles and wires, erected usually upon the opposite side of the right of way from that occupied by the telegraph company's line, but in places erected on the same side, but on higher poles. To require now that

4 Since interference with the railroad's own telegraph line is covered by the reference to "railroad purposes," it follows that "other telegraph line already constructed," in the last clause of section 1, is intended for the pro-tection of the existing line of another telegraph company.

the telegraph company should remove its line from its present location, in order that the railroad company might occupy that same location, would be doing a great injury to one party without any compensating advantage to the other. It is not to be supposed that the railway company desires now to take down its own line, recently erected at great cost, and move it to the location occupied by the telegraph company's line; indeed, we do not find the railroad company claiming any intention of doing so, generally, if the condemnation could be entirely defeated. It is true the railroad company has not erected this line voluntarily, but has been compelled to do so because the telegraph company, through the aid of the courts, has maintained its possession of the preferred line, and hence, the conclusion that the railroad company cannot exercise its theoretical preferential right cannot be based on any election by it; but we think it has sufficient basis in the fact that no other outcome is now practically possible, save to allow the parties to keep their respective locations and compensate the railroad company in damages for the additional expense, past and future, thus caused. Neither party can complain of this conclusion; the railroad company because the alternative—that it may evict the telegraph company from the right of way which the railroad company does not need—cannot be accepted; the telegraph company, because it has selected this preferred location, always insisted upon it, and practically evicted the railroad company therefrom.

[12] 8. The telegraph company urges that the railroad company is entitled only to nominal damages, and hence that questions of evidence on the subject of damages are immaterial. In a case where it is thought that the telegraph company's easement is ambulatory or shifting, and constantly subject to the changing needs of the railroad, and where the telegraph line is to be erected at the edge of the right of way, a pole length away from the track, and not interfering with any present or prospective telegraph line of the railroad company, there is room to contend that nominal damages are sufficient. This result has been reached in several cases more or less dependent upon the conditions just stated. These cases are collected and sufficiently considered by Judge Sanborn, speaking for the Circuit Court of Appeals of the Eighth Circuit, in Northern Pacific Co v. North American Co., 230 Fed. 347, 354, 144 C. C. A. 489, L. R. A. 1916E, 572; and, without intending to pass upon rental value as a measure appropriate to this case, we do not hesitate to apply Judge Sanborn's general conclusion to a case like this, and to hold that the nature of the railroad's property and the character of the easement condemned require substantial, rather than nominal, damages.

Even if the present case indicated nothing more than nominal damages as to the interest "actually taken," so far as that interest can be separately conceived, yet it is one for substantial damages with reference to the diminution of the value of the right of way for railroad purposes. This conclusion would result from the element of conflict with the plaintiff's telegraph line, even if there were

no other element of damages, but also from the other elements we here-after indicate. The evidence strongly tends to show that the location which the telegraph company insists upon occupying and which must be conceded to it under existing circumstances is the natural and best one for the railroad company's line, and that the construction of the latter in other places makes it not only less convenient of use but much more expensive to build and maintain.

[13] 9. Our conclusion that the telegraph company's location is not to be in all respects fixed and permanent affects much of the damage claimed on the trial; but after the revision necessarily following this conclusion, we think the testimony given or offered tended to show that damages to the railroad—that is to say, a lessening of the value of the right of way for railroad purposes—will arise from the following sources:

(a) The necessary use of the railroad property for the maintenance, changing, and repair of the telegraph line. In the adoption of the Patton Case (telephone) into the telegraph company law made by Louisville Co. v. Lang, 160 Ky. 702, 706, 170 S. W. 2, it is perhaps implied that the particular strip needed for access for repairs should be specified. We cannot take this implication as intended to decide the point. It fails to observe the difference between farm lands and a railroad right of way. It would be manifestly impracticable for telegraph company employés to travel or for new poles to be carried along any particular strip away from the track. Practically, these employés must use the railroad track or any part of the railroad right of way that may happen to be necessary. Indeed, there are some miles of this pole line which cannot be reached at all except from the track.

(b) The troubles and delays resulting from the necessary opportunity to be given the telegraph company to move its line when the existing location is sufficiently needed for trackage or structures, excavations or fills, unobstructed vision, or any railroad use, and from collecting the expense of making such removal from the telegraph company if the railroad does the moving itself.

(c) The additional expense, past or future, resultant upon the erection and maintenance and operation of the railroad's telegraph or signal line upon a location less desirable than that which would have been used except for the telegraph company's line. It can make no difference with this additional expense whether or not the railroad company intends to, or has the right to, carry commercial wires upon the same pole line and do a commercial business.

(d) The impairment of the most perfect utility to the railroad of its right of way and tracks in those particulars not sufficiently vital to justify the removal of the telegraph company's line to another location. For example, poles or guys or braces are said to embarrass operations of spreaders, wreckers, pile drivers, steam shovels, blasting work, etc. The fact that the railroad company has acquiesced in this situation for a period of years or desired the same location for its own line is sufficient to show the lack of that obstruction which would be fatal to condemnation; but it is not sufficient to prevent the railroad from claiming damages—if any there are—for these or

similar burdens after it has lost that joint interest in the telegraph line which may have compensated for the acquiescence, or when it is not to have the benefit which might counterbalance the burden.

(e) Additional expense caused by the presence of this additional telegraph line in the matter of keeping the right of way free from weeds and refuse. This duty was imposed by statute (Kentucky Statutes, § 790), but a similar right, if not duty, would exist without statute (Postal Co. v. No. Pacific Co. [C. C. A. 9] 211 Fed. 824, 827, 128 C. C. A. 350). Clearly, any method of keeping the right of way clear is likely to be somewhat more expensive, if there is standing upon it a line of poles to be taken into account. One of these methods is by fire, and the telegraph company offers to release the railroad company from any claim for injury to the poles by fire; but, in spite of such release, the railroad company must, for its own protection against the falling of poles upon its track, exercise great care to prevent the burning of a pole, and, as it would be liable only for negligence, this release does not seem important in the present computation of damages.

(f) Other additional expense of maintenance of way and structures and keeping track open. It is said that poles and wires obstruct ditch cleaning, that poles on a slope cause slides and washouts, that old ties and refuse cannot be so conveniently burned, and that fallen wires and fallen poles must be guarded against and removed.

(g) Any element of danger added to the railroad operations. This diminishes the value of the right of way for railroad purposes. If it is to be reasonably anticipated that poles may fall across the track, that telegraph wires may fall upon signal wires, and interrupt signals, or that the line of poles and cross-arms, particularly on a curve, may interrupt the enginemen's view of signals—all these under conditions which have not called for the removal of the telegraph company's poles and wires to positions of entire safety—this indicates a diminution in value for which the railroad should be compensated.

It is true that many of these elements touch upon the speculative, and yet they constitute the very considerations which the parties would rightfully take into account in negotiating a sale or lease or considering the offer which must precede condemnation; the payment of compensation cannot be postponed until the contingency happens, and the amount must be fixed now by the use of that sound judgment in estimating uncertainties which juries are commonly called upon to exercise.

[14] While it is necessary that both the witnesses and the jury should understand the facts in regard to these separate items and other similar ones, if other there are, upon which they may base opinions and verdict, yet, of course, the final question is as to the entire damages to be awarded as a unit. It may happen, as the record here suggests, that when elements of damage are taken separately and each considered by itself and fixed at an amount which the proof tends to support considering that element alone, yet that the sum total of all the amounts so reached will be so large as to be plainly unreasonable; and the jury may well be cautioned that it should

take proof or estimates of the specific elements of damage only as an aid in solving the general question how much the value of the railroad right of way as a whole is injured by the erection and main-tenance of the telegraph line as a whole.

[15] 10. While it has often been held that the measure of dam-ages, where an easement is condemned, is the difference between the value of the servient estate before and the value after the imposi-tion of the easement, yet this is only a convenient formula. When it is applied to a case of fee title of property subject to sale, it is clear and simple; not so when applied to a railroad right of way which was not held for sale, and which had no market value either before or after condemnation. In such a case, the total of the acreage values of the railroad right of way will only be confusing. The important question is how much the condemned easement damages the right of way for use for all appropriate railroad purposes. No one can be more competent to testify on this subject than railroad men familiar with the cost and effect of every operation which is or may be involved. In the end, much of their testimony will be matter of opinion, but it is of the typical character where opinion evidence must be received because it is the best. It is not necessary that they know the value of the land, because this is not substantially involved; nor is it necessary that they should know former sales of similar rights, for perhaps there never have been any, and, if there have been, each sale was a matter of bargain depending on its own pecu-liar circumstances. Of course, telegraph men, familiar with actual construction and maintenance problems, would be competent wit-nesses, as far as their knowledge extended. For instructive appli-cation of these principles to conditions analogous to those now in-volved, see Sanitary District v. Pittsburgh Co., 216 Ill. 575, 583, 75 N. E. 248; Cochrane v. Com., 175 Mass. 299, 302, 56 N. E. 610, 78 Am. St. Rep. 491; Consolidated Co. v. Baltimore, 105 Md. 43, 54, 65 Atl. 628, 121 Am. St. Rep. 553.

[16] 11. The Kentucky statute, upon which the proceeding was based, is said to be unconstitutional for three reasons, viz.: (1) That a view of the premises was not permitted, whereby the owner was ar-bitrarily deprived of the best evidence of value; (2) that the title of the statute does not sufficiently express its subject, and (3) that it con-templates a final condemnation without notice to mortgagees. These three grounds are thought not to be covered by anything held by this court in Louisville Co. v. Western Union Co., supra., or by the Ken-tucky Court of Appeals in Louisville Co. v. Lang, 160 Ky. 702, 170 S. W. 2, in each of which decisions the statute was upheld against the contentions there urged. Regardless of whether the question of con-stitutionality is not res judicata between these parties, we are not im-pressed that these new objections are insuperable. The statute says "the jury shall not be required to go upon or view such right of way." Considering the very common practice in condemnation proceedings, as well as in all judicial controversies involving the value or condition of property, whereby the trier of fact is permitted, in the discretion of the court, to see the property (a practice recognized by other Kentucky

condemnation statutes), this provision should not be construed as depriving the court of all discretion to permit such view. Both its letter and its spirit are satisfied by holding that it intended that inspection and view of the premises should not be an essential prerequisite to a verdict. The Legislature hardly deliberated on the nice distinction—if there is any—between saying that the jury should not be required to view and saying that a view should not be required, and, with the latter form of words, "required" would naturally be taken as synonymous with "necessary." In many cases, a view of the property would be difficult, confusing, and not helpful; in many cases, it would be far the best possible evidence. The discretionary power of the trial court to permit or to refuse according to the nature of the case ought not to be destroyed, unless by the plainest language; and, to say the least, this language is not plain.

[17] As to the lack of sufficient title for the act, it is enough to say that the title is broad enough to include all provisions of the act, and that the failure of the title to indicate the means to be employed is not a defect so clearly fatal that we would be justified in overturning, on that ground, a statute which has been recognized and enforced by the Kentucky Court of Appeals.

[18] No mortgagee is complaining of lack of notice. If the telegraph company chooses to condemn and pay the award, and take the chance that it is not cutting off a prior right which may ripen into title through foreclosure, we do not see that the mortgagor is concerned in the constitutionality of the statute which expressly sanctions that practice. The Supreme Court has repeatedly refused to hear complaints about the constitutionality of a law, except from those who are hurt. Red River Bank v. Craig, 181 U. S. 548, 558, 21 Sup. Ct. 703, 45 L. Ed. 994; Jeffrey Co. v. Blagg, 235 U. S. 571, 576, 35 Sup. Ct. 167, 59 L. Ed. 364.

[19] 12. The court below had a preliminary trial, in the absence of the jury, in which it heard evidence and determined that there was necessity for the condemnation, and that the telegraph line, as proposed, would not interfere with the ordinary use of the railroad. The railroad company insists that, although trial by jury is not inherently necessary in condemnation cases, yet, under the Kentucky procedure, the form of a common-law trial rather than of an extrajudicial award has been adopted, and hence that the case is one where, by the federal Constitution and statutes, the trial must be by a jury. It is further insisted that the issues cannot be divided up, and part of them excluded from the jury trial.

We do not find it necessary to decide the question which the railroad company presents, so far as concerns the broad issues of necessity and of the forbidden, general interference. The undisputed facts here lead to the inevitable inference that whatever precedent general necessity the law contemplates was present, and that there would not be any such universal, necessary, and serious interference as would broadly forbid condemnation generally. St. Louis Co. v. Southwestern Co. (C. C. A. 8) 121 Fed. 276, 285, 286, 58 C. C. A. 198. Upon these issues it would have been the duty of the court to instruct the jury to find

for the telegraph company, and so it is quite immaterial whether the railroad company was entitled to a jury trial upon them.

[20] However, we infer from the record (the specific question has not been argued) that there are comparatively small fractions of the desired right of way as to which it may be reasonably claimed that the interference with the railroad use is too serious to permit condemnation. For illustration, there may be bridges or tunnels or other structures or short sections of the right of way already so fully occupied that there is no room for another telegraph line in addition to that to which the railroad is entitled for its own use—that is to say, where another line cannot be so placed that it will not substantially obstruct the use by the railroad of its right of way for some railroad purpose. It is not important to examine the details of the present record in this respect. Before another trial is had, conditions may have changed; and in view of the constant probability of such changes and the shifting character which we have ascribed to the easement to be condemned, the judgment finally entered will necessarily speak as of its date in fixing the specific location of the line of telegraph poles and in adjudging that particular location to be requisite; and a change in location thereafter could be demanded by the railroad only because of conditions later arising. Hence it appears that, upon the new trial, disputable questions of necessity—i. e., the forbidden degree of interference—may be found to exist as to specific locations here and there upon the line, regardless of whether the controlling conditions existed at the former trial or have arisen since. If the railroad company's telegraph line at these spots can be built— or, if already built, can be operated—with reasonable safety and without prohibitive expense, then an award of damages will meet the case; if not, these particular locations should be exempted from the condemnation. The judgment to be entered must also recognize the necessary change of location in all instances that have developed up to that time, where, under the principles which we have announced, the railroad had become entitled to require such change.

It is thus apparent that some aspects of the question, whether there must be a jury trial as to necessity for condemnation, or as to the existence of an obstruction to, or interference with, the railroad not rightly to be compensated in damages, are not eliminated, but remain to be decided, in spite of the fact that the effect of the decision will be applicable specifically, and not generally.

It has been expressly held that the right of jury trial secured by the Constitution does not necessarily extend to condemnation proceedings, which need not be in the nature of suits at common law (Bauman v. Ross, 167 U. S. 548, 593, 17 Sup. Ct. 966, 42 L. Ed. 270); but it is also held that, when the condemnation proceeding is put into the shape of a suit at law calling for the action of a court, it must be treated as a case which is removable (Madisonville Co. v. St. Bernard Co., 196 U. S. 239, 246, 25 Sup. Ct. 251, 49 L. Ed. 462), and as a suit at law in which the right to a jury to assess the damages or compensation is declared by R. S. § 566, U. S. Comp. St. 1916, § 1583 (Chappell v. U. S., 160 U. S. 499, 513, 16 Sup. Ct. 397, 40 L. Ed.

510). On the other hand, it is the approved practice, both in Kentucky (Warden v. Madisonville Co., 125 Ky. 649, 101 S. W. 914) and generally (American Co. v. St. Louis Co., 202 Mo. 656, 101 S. W. 576; Western Union Co. v. Louisville Co., 270 Ill. 399, 110 N. E. 583, Ann. Cas. 1917B, 670; Western Union Co. v. Louisville Co., 183 Ind. 258, 108 N. E. 951; Western Union Co. v. Nashville Co., 133 Tenn. 691, 182 S. W. 254; St. Louis Co. v. Southwestern Co., supra, 121 Fed. at page 285, 58 C. C. A. at page 207), unless the statute otherwise directs (e. g., section 8254, Mich. C. L. of 1915), that the question of necessity and similar precedent conditions should be decided by the court in advance of or separately from the jury trial concerning compensation. The Kentucky statute now involved plainly contemplates the practice, for the prescribed forms of oath and verdict relate to compensation only (see sections 4 and 6, supra);[5] and even in Chappell v. U. S., the trial court had determined the necessity before it summoned the jury (see 160 U. S. 502, 16 Sup. Ct. 398 [40 L. Ed. 510]), and this action was not questioned.[6]

We conclude that it is carrying the analogy too far to say that, because a condemnation proceeding is a suit at law within R. S. § 566 (C. S. § 1583), for some purposes, all parts of it must be so considered for all purposes. When we depart from the common-law forms and practice, there may be very distinct issues of fact in the same case, some of which are historically—and seem rightly—proper to be heard by jury and others of which are not. Finding the amount of compensation is another term for assessing damages, and this always has been a recognized function of a jury. The determination of whether there are instances of exception to the general necessity for condemnation in this case, and the exclusion of such fractions of the line, if there are any, from the general condemnation, require a flexibility of judgment and an adjustment of alternatives not peculiarly within the function of a jury as that function is fixed either by theory or by precedent. They approximate at least as closely, and perhaps more nearly, the customary powers of a court of equity. Considering the general—and so far as we know the invariable—practice (where not controlled by specific statute) that these precedent questions should be determined by the court separately from the assessment of damages and observing the lack of any authoritative decision to the contrary in the federal courts, we conclude that whatever trial is to be had concerning these specific locations should be—as it was on the trial under review—to the court and not to the jury.

The subject of compensation for the use of the rights now condemn-

---

[5] So far as the first part of the judgment form in section 7 intimates that the question of necessity went to the jury, it is not sufficient to overbalance the inference from the remainder of the statute.

[6] Perhaps this fact led the reporter to state in the syllabus (p. 499) that the only trial by jury required in such a condemnation as there involved was upon the question of damages, although the opinion does not consider the subject of a trial of the issue of necessity. The Fourth Circuit Court of Appeals, after a historical review, and in applying the constitutional right to jury trial, goes no further than to find the right to a jury to determine damages or compensation. Beatty v. U. S., 203 Fed. 620, 624–626, 122 C. C. A. 16.

ed and during the interval since the contract expired and the injunction was issued is not overlooked; but it is not distinctly presented by this record. We assume that it may hereafter arise in some form.

The proceedings upon the trial may be said to have been generally in accordance with the conclusions we have expressed; but it was otherwise in some vital particulars, and the finding of the court, the verdict of the jury and the judgment entered thereon must be set aside, and the case remanded for new trial upon the question of amount of compensation, and for such further hearing and decision upon the question of the forbidden interference in specific places as we have indicated may be open.

KNAPPEN, Circuit Judge. I concur, but with the qualification that I am not to be understood as recognizing that the telegraph company, after recovery in the condemnation proceeding and payment of compensation, is subject to liability of being ousted by the railroad company from the right of way, in whole or in part.