## THE WAALHAVEN et al.
### No. 261.

Circuit Court of Appeals, Second Circuit.
April 3, 1933.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for appellants.

Single & Hill, of New York City (Robert E. Hill and C. Welmore Robinson, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

In the Waalhaven, 36 F.(2d) 706, 709, we affirmed an interlocutory decree holding the ship liable for the cargo damage the libelant is seeking to recover in this action.

The libelant was the order consignee of the damaged cargo which consisted of sulphate of potash, sulphate of potash magnesia in bags, and kainite in bulk shipped in 1927 on the steamship Waalhaven from Brake and Nordenham, Germany, to Wilmington, N. C. and Jacksonville, Fla. It had sold the cargo to a purchaser at the points of delivery and has been paid the agreed purchase price. The parties stipulated, however, that the libelant "at all the times mentioned in the libel herein, was the owner of the merchandise referred to in the said libel, and was and is entitled to commence and prosecute this action, and was and is the proper party libellant." We take this to mean that the parties have agreed that the libelant is to be treated for present purposes as having the rights of a consignee who had purchased from the exporter in Germany. The merchandise was apparently purchased and shipped c. i. f., but the contract itself was not produced, and, in view of the stipulation, we let that be as it may.

There is now no claim that the libelant is not entitled to recover the contract price of the merchandise less salvage. The real dispute relates to the measure of damages. The commissioner found that there was no market value of the goods at destination, and measured the damages by taking the contract price as the base; while the District Court

held that a market value had been shown and entered its decree for damages to an amount based upon that. Some incidental questions involved in making up the market price will be noticed later.

The fair balance of the evidence went to show that the merchandise damaged was used in the territory adjacent to the points of destination for fertilizer; that the source of supply for that territory was for all practical purposes Germany and France; that, though there was some of this merchandise produced in the western part of the United States, the quantity was small, and it could not successfully be shipped by freight and compete in price with the German and French goods which had the benefit of ocean rates; that, though the Germans controlled about 75 per cent. of the business they had to recognize the French supply; that while the Germans and the French apparently had an understanding which kept prices controlled to their satisfaction, this control came from the fact that they could and did undersell all competitors.

The libelant was the exclusive distributor in this country of German potash salts. It purchased them of the German Potash Syndicate and sold about 80 per cent. of its imports to large fertilizer manufacturers. The remaining 20 per cent. was placed in storage and sold in smaller lots for what were called spot prices. The larger fertilizer manufacturers also sold from 15 per cent. to 20 per cent. of the potash salts they purchased to other manufacturers or to the trade generally at spot prices. The libelant imported about 700,000 tons of this merchandise a year. As it sold about a fifth of this at spot prices and about the same proportion of the remainder which it sold was sold by the purchasers for spot prices, it will readily be seen that the evidence showing that the quantity involved in this suit—623.8 tons of kainite, 211.03 tons of sulphate potash magnesia, and 576.83 tons of sulphate potash—had a market value at the delivery points where it could be purchased at spot prices is based on sound foundation. The evidence of market value which was accepted by the District Court was given by three witnesses who were shown to be thoroughly familiar with the business and with conditions in 1927 in the territory involved. A large quantity of spot potash was sold annually in this district, and their testimony as to the market and the market value was competent evidence. Alfonso v. United States, Fed. Cas. No. 188; Louisville & N. R. Co. v. Western Union Telegraph Co. (C. C. A.) 249 F. 385, 399; Heiner v. Crosby (C. C. A.) 24 F.(2d) 191. Accordingly, we accept the finding of the District Court that a fair market value of this merchandise at the time and place it was to be delivered by the Waalhaven was shown. That being so, such fair market value is to be taken as the basis for computing the damages. New York, L. E. & W. R. Co. v. Estill, 147 U. S. 591, 13 S. Ct. 444, 37 L. Ed. 292; Gulf, C. & S. F. Ry. v. Texas Packing Co. et al., 244 U. S. 31, 37, 37 S. Ct. 487, 61 L. Ed. 970; St. Johns Corp. v. Companhia Geral, etc., 263 U. S. 119, 125, 44 S. Ct. 30, 68 L. Ed. 201; The Capitaine Faure, 10 F.(2d) 950 (C. C. A. 2). Illinois Cent. R. Co. v. Crail, 281 U. S. 57, 50 S. Ct. 180, 74 L. Ed. 699, 67 A. L. R. 1423, is no departure from the general rule, but is authority to the effect that the wholesale market price rather than retail market price is the criterion where that will make good the actual loss. In this case, the fair market value at destination being shown by the so-called spot price, there is no proof of any wholesale price as distinguished from retail price. Apparently, all purchases in quantities no larger than the part of this cargo which was damaged were at such prices.

Some added difficulty has arisen because the witnesses did not testify to the spot price as such but gave the items which entered into it. It was based on what was called the list, which was the price charged for large quantities imported under annual contracts. That corresponds to the contract price of this shipment on the Waalhaven. To this were added port charges of $2.20 per ton and a profit ranging from 5 per cent. to 15 per cent. There was evidence that the list price carried a 10 per cent. discount, and the District Court found that the spot price was fixed on the basis of list less 10 per cent. The appellee insists that the evidence means, on the contrary, that the 10 per cent. was not deducted. What the fact is was not made very clear. The witnesses may have meant list or list less 10 per cent., and we are not inclined to reach a conclusion contrary to that of the District Court, since error on that point has not been clearly shown. Nor was it error to take the lowest percentage of profit when the evidence merely gave the range from 5 per cent. to 15 per cent. It may be that the difference between what was perhaps the equivalent of a wholesale price and the equivalent of a retail price is reflected in the differing percentages of profit. But as to that we are not advised, and it may have been wholly due

to seasonal price changes. In any event, the quantities involved were presumably large enough to be purchasable at what would be the lowest price, and, in the absence of proof to the contrary, that affords an additional reason for approving the action of the District Court in allowing only 5 per cent. for it accords with the principle underlying the decision in the Crail Case.

Decree affirmed.